Filed 6/25/15

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>MAXAMILLION LEE MCDONALD,<br>Defendant and Appellant. | F068281<br>(Super. Ct. No. BF143850C)<br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Thomas S. Clark, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

* Under California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, the introductory paragraph to part II of the Discussion entitled Jury Instructions, part II.A. and C. of the Discussion, and the Disposition are certified for publication.

## INTRODUCTION

On August 19, 2012, Christopher Patterson snatched a gold chain from around the neck of 71-year-old Guadalupe Ramos.[1]  In the process, he either knocked or threw her to the pavement of a grocery store parking lot.  Patterson fled on foot; Maxamillion Lee McDonald (defendant), the driver of a car parked several spaces away from the Ramos vehicle, pulled out of the lot and picked Patterson up a block or two away.  With defendant in the car was Lawrence Slaughter.  The trio — all members of the East Side Crips criminal street gang — then drove to a business that purchased gold.  Meanwhile, Guadalupe developed an irregular heartbeat.  She was pronounced dead about an hour after the robbery.  The day before, defendant, accompanied by Slaughter, had grabbed a gold chain from the neck of a woman in a different store's parking lot.

Defendant now stands convicted, following a jury trial, of first degree murder during the commission of a robbery (Pen. Code,[2] §§ 187, subd. (a), 189, 190.2, subd. (a)(17); count 1), robbery (§ 212.5, subd. (c); counts 2 & 4), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3).[3]  As to counts 1 and 2, the jury further found defendant committed the offense for the benefit of, at the direction of, or in association with a criminal street gang.[4]  (§ 186.22, subd. (b)(1).)  Following a bifurcated court trial, defendant was found to have been previously convicted of a serious or violent felony (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e))

---

[1]    For clarity, members of the Ramos family are sometimes referred to by their first names.  No disrespect is intended.

[2]    All statutory references are to the Penal Code.

[3]    Defendant originally was jointly charged with Patterson and Slaughter in all but one count, but their cases were severed.  Only defendant's case is before us on this appeal.

[4]    A gang enhancement (§ 186.22, subd. (b)(1)) and enhancement for personal infliction of great bodily injury (§ 12022.7) were alleged as to count 4, but set aside prior to trial (§ 995).

and to have served two prior prison terms (§ 667.5, subd. (b)).  Defendant's motion for a new trial was denied, and, the People not having sought the death penalty, defendant was sentenced to an unstayed term of life in prison without the possibility of parole plus 12 years.  He was ordered to pay restitution and various fees, fines, and assessments.

In the published portion of this opinion, we hold there was prejudicial instructional error concerning the requirement that defendant must have aided and abetted the robbery at or before the time of the act causing death.  We also hold the jury was correctly instructed on the specific intent required by section 186.22, subdivision (b)(1).

In the unpublished portion, we conclude:  (1) There was insufficient evidence to support the special circumstance finding; (2) There was sufficient evidence to support the gang enhancements; (3) The error in giving CALCRIM No. 361 was harmless; and (4) The jury was adequately instructed concerning the elements of section 186.22, subdivision (a).  We vacate the special circumstance finding and reverse the conviction and enhancement on count 1, affirm the conviction and enhancement on count 2, affirm the convictions on counts 3 and 4, affirm the prior strike and prison term enhancements, and remand the matter for further proceedings.

<div align="center">

**FACTS**[*]

**I**

**PROSECUTION EVIDENCE**

*The Robberies and Homicide*

</div>

On August 18, 2012, Patrice Oliver, who was then in her late 40's, was shopping with her daughter at the FoodMaxx in the area of Ming Avenue and Stine Road.[5]  They left the store shortly before 3:00 p.m., and Oliver went to load her groceries into the trunk of her car.  Before she reached her vehicle, however, she saw a Black man in his early

---

[*]    See footnote, *ante*, page 1.

[5]    Undesignated dates in the statement of facts are to the year 2012.

<div align="center">3.</div>

20's rapidly approaching her from about 25 feet away. They made eye contact, then he walked past her. Not a second later, he grabbed the back of her neck, her tank top and bra, and the gold chains she was wearing. Everything ripped, and he slammed her to the pavement. She struggled to hold onto her chains, and one broke. She was pulled on the ground for about five feet while he tried to get the chain off her neck. She suffered a scraped arm and leg that took at least two weeks to heal, and her hip still had a small knot on it some eight months later from when she fell.

After gaining control of part of a gold chain, the suspect ran around the end of the store. At no time did Oliver see anyone with him, although a man parked about three stalls away in a white Crown Victoria "just popped up from nowhere" and asked if she was okay. She felt he might have been involved.

Oliver did not contact police the day her chain was taken. She was in shock and had frozen groceries in her car on a hot day, and did not know how fast anyone would respond if she called 911. In addition, the suspect was long gone, and she felt like she had defeated him because she retained most of her gold.

Sometime in the afternoon of August 19, Letrecse Robinson, defendant's girlfriend, saw defendant at the apartments on Haley Street that were managed by her mother. Defendant's mother, Freddie Mae Jackson, lived in the apartment complex. The complex was across the street from Foods Co. Robinson and defendant spent a little time together at her mother's apartment. Lawrence "Lump" Slaughter was with defendant. Defendant was wearing shorts and a T-shirt. Robinson denied that Christopher "Baby Rose" Patterson was with defendant. Although she saw him in the area of the apartments, he was by himself.[6]

---

[6] At the time, defendant was living with his sister, Anita Coleman. On August 19, Coleman went to the apartment complex around 3:00 p.m. to pick up her daughter. Jackson, defendant, and Robinson were there. Slaughter and Patterson, whom Coleman had seen with defendant on other occasions, were in the vicinity when Coleman saw them. Although defendant was by himself when Coleman passed him on her way to her

4.

When defendant and Slaughter came to the apartment complex, Jackson was not home. Robinson was watering the grass in the apartment complex's courtyard while defendant talked to her mother about renting a car. Robinson playfully sprayed his shoes with some water,[7] then he and Slaughter left. Robinson did not see them again that evening.

Robinson owned a Toyota Camry. Jackson had been in physical possession of the vehicle for some time as of August 19. Although Jackson owned a gold Buick, Robinson loaned her the Camry because Robinson did not have a driver's license and Jackson drove her places. Prior to August 19, Robinson had given Jackson permission to let defendant borrow the Camry. When defendant telephoned Robinson sometime that day to ask if he could borrow the car, however, she said no, because she did not want him with another female in the car. She subsequently relented and told him to ask his mother, who had the car keys.

Around 5:00 or 5:30 p.m. on Sunday, August 19, Natalie Ramos took Guadalupe, her 71-year-old mother, grocery shopping at the Foods Co at 2505 Haley Street in Bakersfield. With them was Natalie's 13-year-old daughter, Marisol. Guadalupe, who was four feet 11 inches tall and weighed approximately 72 pounds, was wearing a thick, 18- to 20-inch linked chain with a gold cross. Because she was unable to walk around the

car, she assumed the three had come together. Coleman believed defendant was wearing a white T-shirt and yellow pants.

Bakersfield Police Detective Stratton interviewed Robinson on August 20, and again on August 23. She ultimately told him defendant was at the apartment in the presence of Patterson and Slaughter. Asked what Patterson was wearing, Robinson said words to the effect of, "What they said on TV," and described him wearing a striped shirt.

[7]     When asked at trial if defendant was wearing yellow shorts, Robinson said he was not because she had gotten him wet.

store, she sat in a chair in the front, near customer service, while Natalie and Marisol shopped for her. It took them about 45 minutes to an hour to finish.

Surveillance photographs taken at about 6:22 p.m. showed defendant, Slaughter, and Patterson inside Foods Co. Patterson was wearing a gray-and-black-striped shirt and cargo shorts, the same clothes Robinson had seen him wearing. The photographs showed defendant wearing yellow shorts.

As the Ramoses exited the store together, Marisol saw a Black male in his early 20's, sitting by himself on one of the planters near the door. The man was wearing tan cargo shorts, a black and grayish-black horizontally striped shirt, and a black hat. The women, who moved slowly because Guadalupe could not walk fast, passed this person. Natalie, who was pushing the grocery cart, went on ahead so she could start putting the groceries in the trunk of her vehicle.

Marisol was a step or two ahead of Guadalupe. They were still walking to the car when Marisol saw the man from the planter walk up from behind and grab hold of Guadalupe's necklace and neck. He broke the chain off Guadalupe's neck, then ran. Guadalupe fell to the ground and landed on her back and head. At no time did Marisol see anyone with the man.[8]

Meanwhile, Natalie had just opened the trunk when she saw a shadow from the corner of her eye. She glanced over, and saw that someone had Guadalupe in a choke hold with his left hand from behind. With his right hand, he yanked her chain, which broke, and threw her on her back. She hit her head when she fell. Natalie screamed. The person, who was wearing cargo shorts and a striped shirt with black in it, fled across the parking lot toward Haley Street with Guadalupe's gold necklace. Someone said he was

---

**8**    Store surveillance photographs showed the man walking up from between two cars parked in the lot and sitting on the planter, the Ramoses exiting the store a short while later, and then, approximately 10 seconds after that, the man behind Guadalupe.

going to try to chase him down, and another person called 911.  Natalie did not see anyone with the perpetrator.

When Natalie reached her mother, Guadalupe was breathing, but dazed and unable to respond.  Natalie observed blood on the back of her head.  A man picked Guadalupe up and put her in the back seat of the car, with her head in Marisol's lap.  While in the car, Guadalupe started having trouble breathing.

Miguel Ulloa was stopped for pedestrians in the Foods Co lot when he saw a male walk up to an elderly female, grab her hair and neck, and pull her to the ground.  The woman fell on her back and struck her head on the pavement.  The male, who was African-American, was wearing a black shirt with horizontal stripes and gray to khaki shorts.  He ran, cutting between cars and heading south toward the gas station in the southwest corner of the parking lot.

Ulloa followed, and saw the man run through the gas station, across the street, through the intersection of Height and Haley, down Height, and then turn left at the first street, which was Gurley.  Ulloa then lost sight of him.  Although Ulloa did not see a Camry or any vehicle driving quickly or following the individual who was running, surveillance video showed the person and a vehicle cutting through the gas station toward Haley within seconds of each other at 6:54 p.m.[9]

On August 19, Michael Cuellar was living in an apartment on Gurley Street, one house away from the corner of Height and Gurley.  At about 7:00 p.m., Cuellar was outside when he saw a vehicle — possibly a Toyota Camry — pull up and stop pretty much in the center of the street.  Cuellar could not see the number of occupants.  The car was not there very long; a Black male wearing a striped shirt, shorts, and maybe a

---

[9]     The car and the individual were never captured in the same image.

baseball cap ran across the grass at the corner of Height and Gurley and got into the back of the car, and the vehicle quickly left.[10]

An ambulance and paramedic arrived at Foods Co at 6:58 p.m. in response to a priority one assault call received two minutes earlier. Guadalupe was transported by ambulance to Kern Medical Center. Initially, her heart rate was strong and normal, but midway through the five-minute ride to the hospital, she developed sinus bradycardia (slow heart rate). Guadalupe's breathing also began to slow and become incompatible with sustaining her own airway, and paramedics had to assist her breathing. Upon arrival at the hospital, Guadalupe was in full cardiac arrest. Despite advanced cardiac life support measures being used, Guadalupe died. She was pronounced dead at approximately 7:49 p.m.

Visual examination of the body at autopsy showed abrasions and contusions to the right side of Guadalupe's body, including her neck. She had a history of hypertension, and the autopsy revealed some kidney disease, fibrosis in the lungs, and a fatty liver. The cause of death was determined to be cardiac dysrhythmia (irregular heartbeat), associated with blunt force trauma on the trunk and extremities. Basically, the marked excitation accompanied by physical exertion and emotional distress surrounding the event accelerated her heart rate and led to internal imbalance. There was a surge of adrenaline, followed by deceleration during the waning effect of the adrenalin, causing the heart to beat irregularly and leading to a heart attack. In essence, Guadalupe literally was scared to death.

---

**10** Stratton interviewed Cuellar on August 27. Cuellar told Stratton he believed the vehicle was a silver, four-door Toyota Camry. When shown photographs of Robinson's Camry, Cuellar said it looked similar to the vehicle he saw the person enter, although in the photographs the vehicle looked light green and he recalled it being more silver. Shown surveillance photographs taken of a person at Foods Co, Cuellar told Stratton the striped shirt worn by the person was similar to what was worn by the person he saw entering the vehicle. Cuellar also said there were already two Black males in the vehicle, one in the driver's seat and the other in the front passenger seat.

Oliver was robbed on Saturday. She was watching the morning news the following Monday, August 20, when she saw an artist's sketch of a possible suspect in a similar crime on the television.[11] She immediately recognized the individual as the person who took her chain. She called the police. That same day, Stratton showed her single photographs of six individuals. When he placed the sixth one before her, she immediately — and adamantly — identified him as the person who robbed her. The person was defendant.

Stratton first interviewed defendant on the morning of August 20, following defendant's arrest at the apartment of Dionshana Evans on Feliz Drive in a neighborhood known as Stroller.[12] Defendant, who was advised of his rights, did not give Stratton the names of Slaughter and Patterson. He admitted walking through Foods Co, but denied touching Guadalupe and told Stratton to go look at the surveillance, which he said would show he left by himself. Based on the interview, Stratton conducted further investigation.

Stratton interviewed defendant again on August 23, after reminding defendant of his rights.[13] During this interview, defendant insisted he had walked to the store with

---

[11] Jennifer Baltazar, a Foods Co employee, helped create a composite drawing of the person she believed pulled the chain from Guadalupe. Although Baltazar did not see the actual incident, she had seen the person she believed to be the perpetrator sitting on the planter in front of the store. She described him as a Black male in his early 20's, wearing a striped shirt, shorts, a baseball cap, and gold chains. She heard yelling coming from the parking lot, then he ran past her toward the intersection of Haley and Height Streets, with an older man trying to chase after him, as she was bringing in some grocery carts. When Stratton showed her a photographic lineup, she selected defendant's picture. She was only about 50 percent sure of her identification.

[12] A recording of the interview was played for the jury.

[13] A recording of the interview was played for the jury. By the time of this interview, Stratton did not believe defendant was the person who actually took Guadalupe's chain. Slaughter had already been identified, arrested, and interviewed. Robinson had provided information that Baby Rose, whom Stratton had identified as Patterson, had been at the apartment in defendant's company, wearing the black-and-gray striped shirt, but no one had identified him from a lineup or by similar means. Stratton was hoping to get confirmation from defendant.

two other individuals (whom he still would not name), but then had walked back to the apartment complex by himself while the others remained at the store. Defendant denied driving the perpetrator away in the Camry. When Stratton told defendant that Stratton knew he was with Slaughter (Lump), because Slaughter's global positioning satellite (GPS) ankle monitor put him there at the exact time and showed him running away and getting into defendant's car, defendant said Slaughter was not the person who did it. Defendant admitted Slaughter was one of the two who walked up to the apartment where defendant was located, but insisted Slaughter did not do it and that he (defendant) gave Slaughter a ride in the Buick. Defendant said it was the other person who did it, but he still would not give a name.

Defendant said that he and Slaughter were trying to get a rental car because the Buick was overheating. Robinson's mother was going to help, but only had a debit card, and the car rental place needed a credit card. So Slaughter actually pulled up to the apartment with defendant in the Buick. Defendant asked Jackson if he could use the Camry, but she said he had to ask Robinson. Robinson said no; she was angry because defendant had another woman — Evans — "in the Stroller." Defendant took the Camry anyhow, and when he and Slaughter left from there, his "cuz" — the third person, whom defendant refused to say was Patterson (Baby Rose) — was running across the street with some Mexicans chasing him.[14] Defendant admitted this third person got into the car, in which defendant was the driver and Slaughter was the passenger, but denied having anything to do with what happened at Foods Co. Defendant claimed he did not know what had happened until the person got into the car at Height and Gurley. The three then went to a gas station at Mt. Vernon and East California, where they bought Gatorade and

---

**14**     Based on Stratton's training and experience, the term "cuz" is used among Crip gang members to identify themselves.

gas.[15]  They then went to the Ross Dress for Less store on Ming Avenue, the Vallarta market on East California, and then out to Feliz Drive, where the third person walked off.[16]  Defendant then returned the Camry to his mother, put some water in the Buick, and took the Buick back out "to the Strollers."

In August, Quitin Reyes Chico ran a business on Chamberlain, near Harold Way, in Bakersfield.  It was part of a swap meet called Placita Las Americas, and was immediately to the left of the swap meet building entrance.  Reyes Chico repaired jewelry and purchased gold.  People would bring jewelry in pieces, then Reyes Chico would determine the purity of the gold, weigh the piece, and pay cash.  The entire process could be accomplished in three minutes or less.  He would then melt the gold and sell it.

Jesus Bravo managed Placita Las Americas, a commercial building with retail spaces that were leased out.  Its business hours were 10:00 a.m. to 7:00 p.m.  In July or August, Reyes Chico started converting his business from sales of jewelry and watches into buying gold.  Bravo noticed the clientele was now more hoodlum-type young men.  At times, they would drive up with three or four in a vehicle, and boisterously come in bringing bags of something.  Sometimes Bravo was able to observe that the bags, which were provided to Reyes Chico, contained gold-colored items.  Bravo evicted Reyes Chico in November or December, because Bravo suspected he was dealing in stolen merchandise.

As of August, Brian Miller, a parole agent, was supervising 20 gang-related parolees.  Slaughter was one of them.  Slaughter's GPS history indicated he was present at the scene of both the August 18 and August 19 incidents being investigated by Stratton.

---

**15**     Surveillance footage from the Gasco showed the purchases made at approximately 7:10 p.m.

**16**     Surveillance footage from Ross Dress for Less showed them there shortly after 8:00 p.m.

From 3:11 to 3:46 p.m. on August 18, Slaughter's GPS unit was in the FoodMaxx parking lot on Ming Avenue. From 4:21 to 4:25 p.m. that day, he was in the area of Harold Way.

As of 6:00 p.m. on August 19, Slaughter was at the apartment complex across the street from Foods Co. At 6:18 p.m., he started to travel toward Foods Co. He may have been walking. From 6:20 to 6:30 p.m., he was in the Foods Co parking lot. At 6:31 p.m., he started to move toward Haley Street, and at 6:33 p.m., he was back across the street at the apartment complex. From his speed and location, Miller surmised he was on foot.

According to GPS, Slaughter remained at the apartments until 6:45 p.m., at which point he started moving — probably on foot — back toward Foods Co. From 6:47 to 6:54 p.m., he was in the Foods Co parking lot. Miller could not determine from the GPS data whether Slaughter was inside or outside a car during that time, but it appeared Slaughter remained at the same spot during those seven minutes. At 6:55 p.m., he traveled west out of the parking lot to Haley Street, likely on foot, but possibly in a vehicle. At 6:56 p.m., he was at Height and Gurley. Because his speed of travel was only six miles per hour, he could have been running or in a vehicle. By 6:57 p.m., however, he was obviously in a vehicle, because he was a good distance away and his speed was 27 miles per hour.

At 7:03 p.m., Slaughter was on Harold Way, near Chamberlain. At 7:09 p.m., he was at the Gasco on Mt. Vernon and East California. After that, the GPS monitor placed him at an apartment complex on Feliz Drive. Around 7:44 p.m., he was at the Vallarta shopping center. From 7:47 to 8:02 p.m., he was at the Kmart shopping center at Wilson Road and South Real Road. After that, he went to the Ross shopping center. He left there at 8:29 p.m. and returned to the apartment complex on Feliz. Because he recharged his GPS unit at that location, Miller surmised he was inside a structure.

*The Gang Evidence*

Bakersfield Police Detective Finney came in contact with defendant on May 16. Defendant said he had just come from his girlfriend's residence in the back apartment. When Finney asked why the people who had been out in front of the apartment said they did not know defendant, defendant related it was common among East Side Crips to lie for each other to protect each other from the police. Defendant did not admit membership on this occasion; however, he and Finney discussed the East Side Crips and current goings-on within the gang, such as other members and crimes that had been committed against or by East Side Crips. In addition, the car of Anthony Dabbs, another East Side Crip member, was parked at the same apartment. Defendant told Finney he knew Dabbs.

Defendant had previously admitted to Finney that he was an East Side Crip gang member. On January 9, 2010, Finney and Officer Diaz contacted defendant during a street check. Defendant told them he had always been from the east side, his family was from there, and that was where he grew up and frequented. Defendant said he went so far as to get gas from gas stations in East Side territory, for fear of coming across a rival gang member at a gas station outside of that territory. Defendant said his face is recognized by rival gang members because of what he had done with the East Side Crips. Defendant said he had always been with the East Side Crips because that was the territory into which he was born, and his family members were East Side Crips.

Bakersfield Police Officer Anderberg had over 15 years of law enforcement experience, and was assigned to the Special Enforcement Unit (SEU) as of the time of trial. That unit's primary job was to contact gang members throughout the city, analyze trends and gang activity, and investigate gang crimes. Anderberg had received training concerning gangs and gang members throughout the course of his law enforcement career, and was a member of various associations that focused on, and received training concerning, gangs.

13.

Anderberg went to work for the Bakersfield Police Department in 2000. During his first seven years, he had various assignments specifically focused on the east side of town. During that time, he made arrests of gang members. He became part of the SEU in January 2012. After he was assigned to the SEU, he received training concerning, inter alia, Crip criminal street gangs in general and also specifically those in Bakersfield. The SEU's priority, in the time he was with the unit, was primarily the East Side Crips and the Country Boy Crips, because the bitter rivalry between the two gangs had resulted in several homicides. Some of his investigation, as an SEU member, involved making consensual contact with gang members to try to gain intelligence.

Anderberg explained that as of the time of trial, the biggest gang on the east side of Bakersfield was the East Side Crips, with approximately 550 to 600 members. The gang's territory covered everything east of Union Avenue, with the eastern boundary considered Washington Street. Because there were no rival gang members who could challenge any expansion, however, the gang could go further east if it wanted. The northern boundary was either Truxton Avenue or East California Avenue, and the southern boundary was Belle Terrace. The gang's primary rivals were the Bloods, the West Side Crips, and the Country Boy Crips. The gang's primary criminal activities were weapons violations, drugs and narcotic sales, assaults, and robberies.

Anderberg explained the common signs and symbols used, both in graffiti and tattoos, by East Side Crips. He also listed the various subsets of the East Side Crips, with subsets usually referencing a block where someone grew up within the boundaries of the east side. Two of those subsets were Spoonie G Crips and Stroller Boys. The Spoonie G area was an area of East Third Street, while the Strollers referenced an area south of Highway 58 and west of Cottonwood, in the area of Feliz and McNew.

Anderberg reviewed five cases relating to members of the East Side Crips; based on those cases, his investigations, and speaking with other officers, he opined the East Side Crips were engaged in an ongoing pattern of criminal activity. He also opined,

14.

based on his review of the cases and the dates of the offenses, that Patterson was an active member of the East Side Crips in December 2010; Slaughter was an active member of the East Side Crips in January 2010; and defendant was an active member of the East Side Crips in May 2003 and November 2005.

Anderberg reviewed information concerning defendant, Slaughter, and Patterson. With respect to Patterson, he reviewed offense reports and street checks, and spoke to other officers regarding their contacts with Patterson. Patterson had two monikers — Baby Rose and Young Smack. His jail booking information showed he had "claimed" Crips. Patterson's offense reports showed he had committed crimes in conjunction with East Side Crip members, and had admitted membership in the gang. During a street check on August 12, 2012, Anderberg and another officer contacted Patterson leaving the bar/dance hall known as the Elks Lodge, a known East Side Crip hangout. During this contact, Patterson admitted being an East Side Crip gang member, and said only East Side Crip members or associates were allowed to "hang out" at the Elks Lodge. Patterson also stated he was aware that East Side Crip members were involved in ongoing criminal activity, specifically related to shootings and robberies. Patterson had various tattoos showing membership in the East Side Crips in general and Spoonie G subset in particular. Based on his review of all the information, Anderberg opined Patterson was an active member of the East Side Crips on August 19.

Anderberg also reviewed information concerning Slaughter, whose monikers were Lump, Lil Lump, and Lil-Sye. One offense report occurred at the Elks Lodge; Slaughter admitted being an East Side Crip gang member and displayed knowledge of the gang's primary criminal activities. His jail booking information showed he "claimed" East Side Crips. He also had a tattoo signifying membership in the East Side Crips. Based on his review of all the information, Anderberg opined Slaughter was an active participant in the East Side Crips on August 19.

15.

Anderberg reviewed the same types of information with respect to defendant. Defendant had a number of tattoos showing his membership in the East Side Crips and Spoonie G subset. In five jail bookings that occurred from 2005 to 2012, defendant "claimed" Crip. In the bookings dated February 5 and August 20, he specifically "claimed" East Side. Offense reports showed defendant committing offenses, and associating, with East Side Crip members. The most recent one, not including the charged offenses, took place on February 5 at the Elks Lodge. During one that occurred on January 9, 2010, defendant stated he was a Spoonie G and afraid to go anywhere in Bakersfield but the east side. During an offense report of February 1, 2011, defendant and his companion both admitted their membership in the East Side Crip criminal street gang and displayed current knowledge of the gang and its members. Based on his review of all the information, Anderberg opined defendant was an active member of the East Side Crips criminal street gang on August 18 and 19.

According to Anderberg, an East Side Crip who commits crimes has his status within the gang elevated. The type and severity of the crime committed and whether the person got away with it will determine how the specific offense elevates the person's reputation within the gang. Even if the individual was caught and served time, his reputation as a trusted gang member would be elevated as long as he did not tell on any codefendants. Not all crimes elevate one's status within the gang; killing a 71-year-old woman would not.

Anderberg was asked a hypothetical question based on the facts shown by the prosecution's evidence concerning the August 19 incident. He opined it was committed in association with the East Side Crips, as there were three members together committing robbery, an offense that was among the primary activities of the gang. Having three members together increased their chances of getting away with the offense. In addition, someone who commits a crime by himself cannot bolster his own reputation, whereas if other subjects are present, it is easier to verify that the individual's work for the gang has

16.

actually taken place. Moreover, the involvement of multiple members causes fear and intimidation in the public. Although the age of the victim would not necessarily be favorably looked upon, the fact the three subjects committing robbery would cause fear and intimidation within the public would promote or further the East Side Crips.[17] Anderberg felt the facts of the hypothetical might produce a minor benefit to the gang in the form of any monetary gain from the sale of the jewelry.

## II

### DEFENSE EVIDENCE

Defendant testified that Patterson was the person who pulled the chain from Guadalupe's neck on August 19. Defendant did not tell Stratton that during any of their three interviews, because he did not want to be labeled a snitch. Instead, he told Stratton to look at the surveillance cameras, because they would show what happened and who did it. Defendant felt being labeled a snitch would jeopardize his life and the lives of his family members.

Defendant had been close friends with Slaughter since elementary school. Defendant spent a lot of time on Feliz Drive, in an area called the Strollers, which was a neighborhood of the East Side Crips. Defendant was often at Evans's apartment, which was close to the residence of some members of Slaughter's family.

Defendant had only known Patterson for about six or seven months prior to August. He met him at the Elks Lodge. The two were "[j]ust friends"; they saw each other every Saturday at the Elks Lodge. Prior to August 19, defendant, Patterson, and

---

**17** From what gang members had told Anderberg specifically about this case, Anderberg believed pulling a chain from or killing a 71-year-old woman probably would not be a status crime in a gang. Anderberg explained that if an East Side Crip committed a robbery where proceeds were obtained but no one was injured, it would elevate his status. A robbery "done wrong" has the potential to decrease status, but it would depend on the circumstances.

17.

Slaughter never spent time together at the same time, except at the Elks Lodge, because Slaughter and Patterson did not get along.

Defendant's mother and Robinson's mother lived in the apartments on Haley, across the street from Foods Co. Defendant went there almost every day to check on his mother. Slaughter occasionally accompanied him, but never went to those apartments by himself. Patterson had a female staying around the corner, and sometimes Patterson would ask Robinson's mother for cigarettes.

Defendant spent the morning of August 19 on Feliz. Defendant had seen Slaughter on Feliz part of the day; Slaughter was hanging out in the parking lot, which was visible from Evans's window. Around 4:30 p.m., defendant drove to the Haley apartments in the Buick belonging to defendant's mother. Slaughter accompanied him, because he knew a woman who worked at the rental car place from which defendant was trying to rent a car.[18] The pair went to the apartments because they needed a credit card in order to rent a car, and Robinson's mother said she had one. It turned out she only had a debit card, however.

Defendant and Slaughter remained at Robinson's mother's apartment, chatting with Coleman, Robinson, and Robinson's mother, for about an hour and a half. They had been there about an hour when Patterson showed up. He saw defendant and Slaughter, and they started talking. At some point, Robinson "had a little attitude" and went outside and started watering the grass. When defendant went outside to talk to her, she wet the dirt, and it got on his socks and shoes. Defendant went in the back to his mother's apartment, but his mother was gone. Her husband was there, but defendant's mother had a lock on the room in which defendant kept his belongings.

---

**18**     Defendant needed a rental car because school was starting the following Monday, and he had to take his son to school. Defendant had the Buick, but it was overheating. Defendant was aware Slaughter was wearing a GPS monitor.

Defendant walked back and asked Robinson where his mother had gone, because his mother had been driving the Camry, and it had been there earlier. Told she went to the store, defendant changed into some shoes he had in the Buick, and he, Slaughter, and Patterson walked across the street to the store. It was sometime between 6:00 and 6:30 p.m. The three went inside the store to look for defendant's mother, but they did not find her. They were inside long enough to walk through the whole back and to the front and out the exit. Slaughter was walking with defendant; defendant was not sure what Patterson was doing in the store, because defendant was not paying attention to him but was looking down aisles for his mother.

Defendant remained in the store no more than five minutes, then walked back to the apartments by himself.[19] He believed Slaughter was standing in line to buy a soda. When his mother still was not home, defendant got in the Buick and drove back to pick up Slaughter and Patterson. This was around 6:15 or 6:30 p.m.

Defendant was driving to the Foods Co parking lot at the same time as Slaughter and Patterson were walking toward the apartments. Defendant picked them up near the Foods Co gas station. Defendant planned to go back to the Feliz apartment, where he also had some clothes but, as he drove through the parking lot, he saw his mother coming from one of the other stores near Foods Co. He followed her to the Haley apartments,

---

**19**     Defendant acknowledged telling Stratton that he walked to Foods Co with some "baby gangsters," meaning Slaughter and Patterson. When he told Stratton they were trying to "get on" at the store, he meant they were "doing their own thing." They were talking about committing crimes, although they were not talking about a crime that was going to occur at that store. They were not talking about a robbery or about Guadalupe, whom defendant never saw. They were talking about something going on "in the Strollers." They were also talking about females in the store. To defendant's knowledge, Patterson had never committed a robbery. Patterson was "a bullster," meaning someone who stole clothes, shoes, and miscellaneous merchandise. Patterson was trying to make a name for himself, and Slaughter was telling him, "That's not how you go about it."

19.

parked the Buick, got out, and started talking to her. Slaughter and Patterson remained in the Buick.

Defendant went inside his mother's apartment and changed his clothes. He then asked if he could use the Camry, because the Buick was running hot. She told him he had to ask Robinson. He then telephoned Robinson. During the conversation, he could see that Slaughter and Patterson were in the apartment complex parking lot, by the Buick. He told them to go across the street, because if Robinson saw them, she would not let defendant take the car.[20] Once they left, defendant had a face-to-face conversation with Robinson, who let him take the car on condition he not have Evans in it.

Once defendant obtained the Camry, he drove back to the Foods Co parking lot and parked. This was about 6:45 p.m., some five to eight minutes before the incident happened. The Ramos family's vehicle was parked a few spaces away. Slaughter and Patterson were in the car with defendant. Slaughter was in the front passenger seat, smoking a cigarette; Patterson was sitting behind Slaughter, smoking "spice"; and defendant was talking on the phone to Evans.[21]

Patterson said he was going to go get some soap from Foods Co. Defendant did not care; he was still talking on the telephone. Slaughter remained in the car, while Patterson exited through the back passenger door on Slaughter's side. Because of the direction defendant was parked, he could not see the entrance of the store or that Patterson went and sat on the cement planter. Two or three minutes after Patterson got out of the car, however, defendant heard screaming. When he turned around and looked, he saw Patterson running across the parking lot with some Mexicans chasing him. Defendant did not know where Patterson was going, but when defendant backed up and

---

[20]    On a prior occasion when Robinson had loaned defendant her car, he and another male were pulled over by police, and both ran because they were on parole. The police them impounded Robinson's car.

[21]    According to defendant, "spice" is something like marijuana.

20.

headed toward the parking lot exit onto Haley, Patterson was running toward the gas station. Defendant did not know what Patterson had just done. He had not seen Guadalupe and her family. He did not tell Patterson to take someone's chain.

As defendant pulled out of the parking lot, he had no plan except to pick up Patterson because people were chasing him. Defendant figured something had happened, because Patterson was "stupid" and the type of person who would punch somebody for no reason. Defendant did not know what had happened, however.

As defendant came onto Haley, he could see Patterson crossing the intersection of Haley and Height and running down Height. By the time defendant reached Height, Patterson was on the opposite side of the street, turning toward Gurley. When defendant pulled up, Patterson got in the car. Patterson was in front of defendant, who could see his progress. There was no agreement beforehand to meet at Gurley and Height. When defendant saw Patterson running, defendant thought he was just trying to get away from whatever happened. Patterson was still running as defendant was pulling up, and when defendant turned the corner, Patterson immediately got in on the driver's side, and defendant drove off.

As they drove off, defendant asked Patterson what he did. Patterson said he just snatched a chain. Defendant did not know what had happened prior to Patterson getting into the car. Defendant did not tell Patterson to get out, because defendant was not the person who did it and so did not care what Patterson just did. Slaughter was mad at both of them. He was mad at defendant because defendant let Patterson get in the car.

Defendant planned to return to Evans's apartment on Feliz. However, he needed to get gas. He went to a Gasco at Mt. Vernon and California, because it was the closest one to the neighborhood, and it was "like a safety zone there." He was not going to run into anybody there. He had had a bad experience at a gas station, and so just started going to the gas stations close to his neighborhood, where he felt safe. Defendant used the route he habitually took from his mother's residence to the Gasco, which took him

21.

onto Chamberlain. Patterson asked him to make a quick stop on Harold Way. Defendant did so, but did not know why Patterson made the request. Defendant pulled up, Patterson got out and went inside, defendant turned the car around, and Patterson came and got back in the car. Patterson was gone 45 seconds to a minute. Neither Slaughter nor defendant got out. In fact, defendant had never been in the swap meet building. They then continued on to the Gasco, where Patterson showed defendant the chain for the first time. They were there about 10 minutes, then drove to Evans's apartment on Feliz.

Once at Feliz, defendant tried to get rid of Patterson. The problem was that Patterson had left his cell phone in the Buick and wanted it back. Defendant went inside the apartment to talk to Evans. When he came back out, Slaughter was in the parking lot, talking to a female, and there were two other males there. Defendant did not see Patterson, so he assumed Patterson had walked off. Patterson then returned, having changed his shirt.

About 20 to 30 minutes later, defendant, Slaughter, and Patterson left to go to the Vallarta market. Slaughter was driving the Camry and defendant was in the front passenger seat. Defendant asked Slaughter to drive because he (defendant) was going to meet someone named Ashlin. Defendant and Slaughter had talked; Slaughter did not want to ride around with Patterson in the car. So they went to Vallarta, where defendant met the woman as planned. They were supposed to be meeting Patterson's sister at Kmart, so she could pick Patterson up, but when they got there, Patterson wanted his phone and his sister said she had no gas. Patterson wanted defendant to take him back to the Haley apartments so he could get his phone. Defendant knew that once he did so, he would have to return the Camry, so he decided to finish using it first.

After going to Kmart, defendant, Slaughter, and Patterson went to the Ross store and went inside.[22] They then drove back to Feliz. This was around 8:30 p.m. On the way, defendant's mother telephoned him and told him a lady was robbed across the street and died. Defendant realized this was the incident in which Patterson was involved.

When they arrived at Feliz, Patterson walked to the McNew apartment of his friend Shanice. That was the last defendant and Patterson were together before they were arrested. Stratton arrested defendant about 4:30 the next morning at Evans's apartment.

Defendant was aware a composite picture had been released to the media. He learned of this when he went to court, after he was already in custody. The composite was not him. Defendant denied being at FoodMaxx at any time on the day of August 18. He denied assaulting Oliver and taking her gold chain. Although he saw Slaughter that day, defendant was not in his company at FoodMaxx. Defendant did not learn Slaughter's GPS monitor was at the FoodMaxx that day until around September 5, when he, Slaughter, and Patterson were in the jail, going to arraignment.

Defendant, who was 27 years old at the time of trial, last got an East Side Crip tattoo between 2003 and 2005, when he was first arrested. He identified with the East Side Crips, and had since he was around 15 or 16 years old.[23] In 2003, defendant was convicted of assault with a deadly weapon involving a firearm, and, in 2005, of evading police and carrying a loaded firearm. Both times, he had a gun for protection, because he had gotten shot on December 1, 2002, when he was 17 years old. His companion, Antoine "Papoose" Daniels, who was a year younger, was shot and killed in the incident. After that, defendant got a gun.

---

**22**     Anytime defendant was not on the east side, he preferred to go inside where there were surveillance cameras, because if someone saw him, they likely would not do anything because they knew they were on camera.

**23**     Defendant admitted he had been a gang member since he was about that age.

23.

Defendant acknowledged that, in incidents about which Anderberg testified, he was in the company of East Side Crips. Defendant was in their company, although he knew he was not supposed to be, because he grew up with them. During one of the incidents, defendant was not associating with the person; they were both pumping gas and merely shook hands. In none of the incidents was defendant carrying a gun or engaging in illegal activity.

Defendant denied knowing every person who was an East Side Crip or what that person was doing. He explained that if several East Side Crips were in a car and one had a gun, that person might or might not tell the others he was armed. The same was true if one had drugs. Defendant acknowledged telling Stratton he was known by other East Side Crip members as being a part of the East Side Crips. In addition, Slaughter was known to defendant to be an East Side Crip gang member. Defendant was aware of some, but not all, of Slaughter's crimes. Similarly, defendant knew Patterson to be an East Side Crip gang member and was aware he had committed crimes. In defendant's opinion, shootings, mail theft, and possession of firearms were primary criminal activities of the East Side Crips. Defendant acknowledged the East Side Crips were engaged in an ongoing pattern of criminal activity.

## DISCUSSION

### I[*]

#### SUFFICIENCY OF THE EVIDENCE

Defendant challenges the sufficiency of the evidence to sustain the jury's true findings on the robbery-murder special circumstance on count 1 and the gang enhancements on counts 1 and 2.

The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below,

---

[*]      See footnote, *ante*, page 1.

24.

substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  Substantial evidence is that evidence which is "reasonable, credible, and of solid value."  (*People v. Johnson*, *supra*, at p. 578.)  An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Reilly* (1970) 3 Cal.3d 421, 425.)  An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367).  "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence.  [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.)  Reversal on the ground of insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies to special circumstances and enhancements as well as substantive offenses (*People v. Cunningham* (2001) 25 Cal.4th 926, 1010; *People v. Leon* (2008) 161 Cal.App.4th 149, 161; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1224).

A.     **The Robbery-Murder Special Circumstance**

Defendant contends the evidence failed to establish he was a major participant who acted with reckless indifference to human life, as required for count 1's special circumstance.  We agree the evidence does not show defendant acted with reckless indifference to human life.

"'All murder … which is committed in the perpetration of, or attempt to perpetrate [robbery and other enumerated felonies] … is murder of the first degree [under section 189].' [Citation.]  The mental state required is simply the specific intent to commit the underlying felony [citation], since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute.  [Citations.] 'Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning — if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances.'  [Citation.]"  (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)  Thus, "[t]he purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony.  [Citation.]"  (*Ibid*.)

The mere fact a felony enumerated in section 189 was committed and death resulted is, however, insufficient of itself to establish a robbery-murder special circumstance with respect to a person who aided and abetted but was not the actual killer. Rather, the nonkiller must aid and abet the commission of murder in the first degree with the intent to kill (§ 190.2, subd. (c)), or, lacking intent to kill, must aid and abet the commission of a felony such as robbery "with reckless indifference to human life and as a major participant …."  (*Id*., subd. (d).)[24]

---

[24]  Subdivisions (c) and (d) of section 190.2 read, in their entirety:  "(c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4.  [¶]  (d) Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found

26.

Section 190.2, subdivision (d) was enacted to bring state law into conformity with prevailing Eighth Amendment doctrine, as set out in the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). (*People v. Estrada* (1995) 11 Cal.4th 568, 575 (*Estrada*); *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 298 & fn. 16.) In *Tison*, two brothers aided an escape by bringing guns into a prison and arming two murderers, one of whom they knew had killed in the course of a previous escape attempt. After the breakout, one of the brothers flagged down a passing car, and both fully participated in kidnapping and robbing the vehicle's occupants. Both then stood by and watched as those people were killed. The brothers made no attempt to assist the victims before, during, or after the shooting, but instead chose to assist the killers in their continuing criminal endeavors. (*Tison*, *supra*, 481 U.S. at pp. 151-152.) The Supreme Court held the brothers could be sentenced to death despite the fact they had not actually committed the killings themselves or intended to kill, stating: "[R]eckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result. [¶] The [brothers'] own personal involvement in the crimes was not minor, but rather, … 'substantial.' Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each … was actively involved in every element of the kidnap[p]ing-robbery

guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

Subdivision (a)(17)(A) of section 190.2 provides for a penalty of death or life in prison without the possibility of parole for a defendant found guilty of first degree murder committed "while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit," robbery.

and was physically present during the entire sequence of criminal activity culminating in the murder[s] … and the subsequent flight.  The Tisons' high level of participation in these crimes … implicates them in the resulting deaths."  (*Id*. at pp. 157-158.)

The *Tison* court pointed to the defendant in *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) as an example of a nonkiller convicted of murder under the felony-murder rule for whom the death penalty was unconstitutionally disproportionate.  Enmund was the driver of the getaway car in an armed robbery of a dwelling whose occupants were killed by Enmund's accomplices when they resisted.  (*Id*. at pp. 783-784; see *Tison*, *supra*, 481 U.S. at p. 146.)  In deciding the Eighth Amendment to the United States Constitution forbid imposition of the death penalty "on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" (*Enmund*, *supra*, at p. 797), the high court emphasized that the focus had to be on the culpability of Enmund himself, and not on those who committed the robbery and shot the victims.  (*Id*. at p. 798.)  "Enmund himself did not kill or attempt to kill; and, … the record … does not warrant a finding that Enmund had any intention of participating in or facilitating a murder.…  [T]hus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims].  This was impermissible under the Eighth Amendment."  (*Ibid*.)

In *Tison*, the United States Supreme Court acknowledged that the Tison brothers likewise did not intend to kill, and so they did not "fall within the 'intent to kill' category of felony murderers for which *Enmund*" found the death penalty permissible.  (*Tison*, *supra*, 481 U.S. at p. 151.)  The court found it "equally clear," however, that the pair also fell outside the category of felony murderers for whom *Enmund* found the death penalty disproportional (*Tison*, *supra*, at p. 151):  The facts shown by the record "not only indicate[d] that the Tison brothers' participation in the crime was anything but minor;

28.

they also … clearly support[ed] a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at p. 152.)

In the present case, the parties agree there is no evidence defendant harbored an intent to kill. Accordingly, as the trial court instructed, the jury could only find the special circumstance allegation true by finding defendant was a major participant in the crime and acted with reckless indifference to human life.

Defendant says he was merely the getaway driver, who, like Enmund, was sitting some distance away from the site of the robbery; he did not provide Patterson with a weapon or (insofar as the evidence shows) possess one himself, and did not personally participate in the taking of Guadalupe's chain or the application of force or fear. Simply being the getaway driver was insufficient to render him a major participant in the crime, he argues, as shown by contrasting the facts of *Enmund* with those of *Tison* and a number of other cases in which the reviewing court upheld a determination the defendant was a major participant. (See, e.g., *People v. Smith* (2005) 135 Cal.App.4th 914, 928 [defendant was one of only three perpetrators, served as only lookout to attempted robbery occurring in occupied motel complex, and stood sentry outside victim's room, where jury could infer he monitored and guarded increasingly loud and violent attempted-robbery-turned-murder], overruled on another ground in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291; *People v. Hodgson* (2003) 111 Cal.App.4th 566, 579-580 [defendant was one of only two individuals involved, making his role more notable, conspicuous, and essential than if shooter had been assisted by coterie of confederates; defendant used his body to slow closing automatic garage gate, and so was instrumental in assisting killer to escape with proceeds from robbery]; *People v. Proby* (1998) 60 Cal.App.4th 922, 929 [defendant and actual killer were both armed and actively participated in robbery; defendant provided actual killer with gun used to kill victim]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 [defendant helped plan robbery and was instrumental in arranging for actual killer to enter victim's home with rifle].)

In terms of the phrase "major participant," "[t]he common meaning of 'major' includes 'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.' [Citation.]" (*People v. Proby*, *supra*, 60 Cal.App.4th at pp. 933-934.) Here, there was evidence from which jurors could have found defendant not only picked Patterson up, thus helping him escape, but was inside the Foods Co with Patterson and Slaughter, looking for a potential victim, approximately half an hour before the robbery, at a time when Guadalupe (who was wearing her chain) was sitting inside the store; then returned to the apartment complex and procured a getaway vehicle that would not overheat as they made their escape and traveled to a location at which the loot could be sold.

We need not determine whether the foregoing is sufficient to sustain a finding defendant was a major participant, although we believe a strong argument can be made that he was. The evidence must also show he acted with reckless indifference to human life. It does not.[25]

In *Estrada*, the California Supreme Court read *Tison* to "instruct[] that the culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death'

---

[25] In *Tison*, *supra*, 481 U.S. at page 158, footnote 12, the United States Supreme Court stated: "Although we state these two requirements separately, they often overlap. For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding." Under the circumstances of this case, we do not believe the fact defendant arguably was a major participant lends support for a finding he acted with reckless indifference.

The Attorney General relies heavily on the gang expert's testimony and opinions, and on defendant's day-before robbery of Oliver. We fail to see how jurors reasonably could have inferred from such evidence — particularly that presented by the gang expert — that defendant was a major participant, or acted with reckless indifference to human life, in the robbery of Guadalupe.

[citation]," and, so "ascribe[d that meaning] to the statutory phrase" in subdivision (d) of section 190.2. (*Estrada*, *supra*, 11 Cal.4th at p. 577.) The court concluded that the phrase "is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death. The common meaning of the term 'indifference,' referring to 'the state of being indifferent,' is that which is 'regarded as being of no significant importance or value.' [Citation.] To *regard* something, even to regard it as worthless, is to be aware of it. [Citation.]" (*Ibid.*) Thus, "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony. This is the meaning intended by the phrase 'reckless indifference to human life' as it is used in section 190.2[, subdivision ](d), and as defined in *Tison*." (*Id.* at p. 578.)[26]

Considering the record in accordance with the standard principles of appellate review as set out *ante*, we find no evidence defendant was subjectively aware his participation in a chain-snatch robbery created a grave risk to human life. (Cf. *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1115-1117 [jury could have found defendant acted with reckless indifference where she lured victim into secluded alley to be robbed, knowing her confederate had a gun, and, after hearing gunshot, failed to help victim or call 911]; *People v. Smith*, *supra*, 135 Cal.App.4th at p. 927 [same; even if defendant

---

[26]     Although the California Supreme Court determined in *Estrada* that trial courts have no sua sponte duty to explain the phrase "reckless indifference to human life" to the jury because the phrase "is commonly understood to mean that a defendant subjectively appreciated that his or her conduct created a grave risk to human life, and thus conveys the meaning of section 190.2[, subdivision ](d), as derived from *Tison*" (*Estrada*, *supra*, 11 Cal.4th at p. 581), the standard jury instruction — CALCRIM No. 703 — includes a definition of the phrase. Pursuant to that instruction, defendant's jury was told: "A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death."

31.

remained outside victim's room as lookout, jury could have found defendant gained subjective awareness of grave risk to human life during time it took victim to be stabbed and beaten and have head slammed through wall; in addition, when killer emerged covered in blood, defendant chose to flee rather than going to victim's aid or summoning help]; *People v. Hodgson*, *supra*, 111 Cal.App.4th at p. 580 [same; defendant had to be aware use of gun to effect robbery presented grave risk of death, yet, rather than coming to victim's aid after first shot, chose to assist killer in accomplishing robbery by trying to keep garage gate from closing until killer could escape from garage with loot]; *People v. Proby*, *supra*, 60 Cal.App.4th at p. 929 [same; defendant provided gun to cohort, who shot victim in back of head; defendant saw something oozing from victim's head but instead of attempting to assist him or determine if he was alive, joined killer in taking money and fleeing; defendant and killer had previously participated in armed robbery the circumstances of which made defendant aware of killer's willingness to do violence although victims of earlier robbery were not killed]; *People v. Mora*, *supra*, 39 Cal.App.4th at p. 617 [same; defendant admitted planning to go to drug dealer's home at night to rob him by having confederate enter with rifle that fired three-inch bullets; although he did not know whether victim was still alive after being shot, defendant did not attempt to aid victim, but instead carried through with original plan to steal victim's drugs, personally carried away loot, left victim to die, and threatened remaining victim]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 [same; defendant and two cohorts planned to rob victim for her car; defendant went into restroom at beach to rob victim, aware that one cohort had a knife and was outside, getting ready to run in; after defendant struggled with victim, who screamed, cohort entered and stabbed victim twice in torso; defendant did not attempt to prevent stabbing, but fled with accomplices and robbery loot, leaving victim to die].)

In the present case, there was no evidence any of the three participants was armed with a deadly weapon of any sort. The robbery took place in an unsecluded, public area,

and was obviously meant to be a quick grab-and-go type of theft. Although defendant was aware, from his own commission of a similar crime a day earlier, that force might be used, the force necessary to turn theft into robbery does not carry a grave risk of death. (See *People v. Burns* (2009) 172 Cal.App.4th 1251, 1259 [defendant grabbed victim's purse; use of his strength and act of stepping on her foot to overcome her resistance constituted sufficient force for robbery].)

The Attorney General argues putting an elderly woman in a choke hold and forcibly throwing her to the asphalt of a parking lot, where her head could easily be injured, carries with it a grave risk of death. However, as defendant points out, the focus is on *defendant*'s subjective awareness of the grave risk created *by his or her participation* in the underlying felony. (*Estrada*, *supra*, 11 Cal.4th at p. 578; see *Tison*, *supra*, 481 U.S. at p. 152 [facts supported finding Tison brothers subjectively appreciated *their acts* were likely to result in taking of innocent life].) Here, defendant participated as the getaway car driver and possibly as a coplanner. He did not supply a weapon or personally use force, nor did he have reason to believe death might be the result. It is true that after the forcible taking of Guadalupe's chain, defendant went to his cohort's aid, not the victim's. But we can only speculate whether he could see Guadalupe or realized she had been knocked to the ground, or, assuming he saw, had reason to believe she was injured or in need of assistance when other people were already helping her. "'[S]peculation is not evidence, less still substantial evidence.' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 735.)[27]

---

[27]    The prosecutor did not offer jurors any theory of how the evidence met the requirements for a true finding on the special circumstance. Instead, he told them: "If you make the finding as to murder, you move on to the special circumstance, murder committed during a robbery. Again, the defendant committed or aided and abetted a robbery. The language is almost exactly the same. The defendant intended or intended to aid and abet the perpetrator in committing that robbery. If the defendant did not personally commit the robbery, then the perpetrator, whom the defendant was aiding and abetting, if he caused the death, he's liable under the special circumstance." The

33.

The Attorney General also asserts: "Any time a perpetrator engages in a violent course of criminal conduct, the perpetrator does so with the risk that the results may be much more catastrophic than expected. That is the risk that is assumed when committing violent crimes, including when committing them in concert with others." We agree; this is one reason for the existence of the felony-murder rule. We disagree, however, that engaging in a violent course of criminal conduct that gives rise to results more catastrophic than expected necessarily means the perpetrator exhibited reckless indifference to human life. Were that the case, a robbery-murder special circumstance would automatically attach in virtually every case in which an aider and abettor was a major participant in a felony listed in section 189.

Because the evidence is insufficient to sustain the jury's true finding on count 1's special circumstance, we order that finding vacated. Retrial of the special-circumstance allegation is barred. (*People v. Lewis* (2008) 43 Cal.4th 415, 509, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 918-920; see *People v. Hatch* (2000) 22 Cal.4th 260, 271-272.)

B.      **The Gang Enhancements**

Defendant argues the evidence did not show the robbery of Guadalupe was committed for the benefit of or in association with the East Side Crips criminal street gang; hence, the gang enhancement findings on counts 1 and 2 must be reversed. We disagree.

Section 186.22, subdivision (b)(1) prescribes the imposition of a sentence enhancement (or, in the case of a felony punishable by life imprisonment, a minimum

---

prosecutor also told jurors, with respect to aiding and abetting liability, that defendant did not have to know Patterson was going to rob *Guadalupe*, just that a taking was going to occur. Although jurors were properly instructed on the special circumstance and were not limited to the prosecutor's theories or arguments, the prosecutor's remarks suggest he either was unaware of the applicable law or simply had no theory as to how anything more than felony murder itself was shown by the evidence.

parole eligibility date) upon "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...."[28]

"[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang." (*People v. Martinez* (2004) 116 Cal.App.4th 753, 762, italics omitted.) To prove the elements of the gang enhancement, the People may present expert testimony on criminal street gangs, as they did in this case. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048; *People v. Gardeley* (1996) 14 Cal.4th 605, 617-620.) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the ... gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see *People v. Albillar* (2010) 51 Cal.4th 47, 63 (*Albillar*).)[29] The expert's opinion may be based on facts given in hypothetical questions, so long as such questions are rooted in the facts shown by the evidence at trial, and any material that forms the basis of an expert's opinion testimony is reliable, although it need not ordinarily be admissible. (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 618.)

---

[28] Defendant does not claim the evidence was insufficient to prove the East Side Crips were a criminal street gang within the meaning of the statute (see § 186.22, subd. (f)). No attempt has been made at any time to establish counts 1 and/or 2 were committed at the direction of a criminal street gang. Additionally, and contrary to the Attorney General's apparent belief, defendant does not challenge the sufficiency of the evidence regarding the statutorily required intent. Accordingly, we do not discuss those subjects.

[29] Even if a gang expert's testimony alone would be insufficient to find an offense gang related (see, e.g., *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657), our analysis takes into account the expert testimony presented at defendant's trial in conjunction with the remaining evidence.

Section 186.22, subdivision (b)(1) requires that the felony be "committed for the benefit of, at the direction of, or in association with" a criminal street gang in order that a criminal offense will be subject to increased punishment under that statute only if the crime is gang related. (*Albillar*, *supra*, 51 Cal.4th at p. 60.)[30] "Not every crime committed by gang members is related to a gang." (*Ibid.*) If, however, the crime was committed in association with the gang, the crime was gang related. (*Ibid.*) Here, the People presented evidence McDonald committed the offenses in association with Patterson and Slaughter, whom, by his own testimony, he knew to be fellow members of the East Side Crips. Thus, the People presented evidence McDonald committed the offenses "in association with any criminal street gang" as required by section 186.22, subdivision (b)(1). (*People v. Leon*, *supra*, 161 Cal.App.4th at p. 163.)

Anderberg, the prosecution's gang expert, testified, based on what he had been told by gang members themselves, that East Side Crips committed crimes together with other gang members because there was safety in numbers; the likelihood of the offense being successful was greater when they had numbers; it prevented snitching if each participant had the same level of exposure to punishment if they were caught, with the consequences of telling on another gang member to law enforcement running the gamut from the snitch receiving a beating to the snitch being murdered; it helped them act as a lookout for law enforcement when they were committing the crime; and it served as an intimidation factor if there were witnesses. Anderberg also testified that if someone committed a crime and that person was a member of the East Side Crips, that person's status would be elevated, whereas an East Side Crip member who did not commit any crimes would not have a good reputation within the gang. While Anderberg conceded killing a 71-year-old woman would not elevate one's status within a gang, he opined, in

---

[30]     The requirements being stated in the disjunctive, as defendant's jury was instructed, the evidence need only show one. (See *People v. Morales* (2003) 112 Cal.App.4th 1176, 1197.)

response to a hypothetical question based on the prosecution's evidence at trial, that the incident in question was committed in association with the East Side Crips, and also might have a minor benefit to the gang. Anderberg explained that the offense was in association with members of the East Side Crips, because "You have three members together committing an offense, which is the primary activities [*sic*] of the gang, robbery. By three members being together, it increases their chances of getting away with the offense; one subject either acting as a lookout or a getaway driver. It also — you can't — if you commit the crime by yourself, you can't bolster your own reputation. If you have other subjects there, it's easier to — to verify that your work for the gang has actually taken place. And it — when you have multiple members, given the type of offense that is committed, it also benefits — or the multiple numbers, it causes fear and intimidation with the public." Anderberg further explained the nature of the incident would promote or further the East Side Crips because, although the age of the victim would not necessarily be looked upon favorably and would not be considered what is traditionally seen as a status crime in a gang, the byproduct of three subjects committing that type of robbery would be fear and intimidation on the part of the public.

A reasonable juror could have concluded, based on the evidence as a whole, that counts 1 and 2 were committed in association with a criminal street gang, as opposed to merely having been perpetrated by three people, who happened to be gang members, committing crimes as a group "on a frolic and detour unrelated to the gang." (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198.) Contrary to defendant's argument, the evidence was sufficient to show "conduct exceed[ing] that which was necessary to establish that the offenses were committed in concert. Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police …." (*Albillar*,

37.

*supra*, 51 Cal.4th at pp. 61-62.) Jurors reasonably could have found the robbery was committed pursuant to a preconceived plan in which one would approach the victim (so as to be less noticeable than if all three approached) and commit the taking, and the other two would remain a fairly short distance away, ready to assist in the perpetrator's escape, either physically or by intimidating witnesses or anyone who gave chase, should the need arise. That Patterson ran from the parking lot instead of directly to defendant's car does not change our conclusion, because jurors reasonably could have inferred a successful escape might have been less likely had Patterson run directly to a vehicle that turned out to have been parked a few spaces from that of the victim's family.

In light of the foregoing, and despite the absence of overt indications of gang affiliation or gang-related motives, such as the flashing of gang signs or wearing of gang colors, we find "substantial evidence that defendants came together *as gang members* to [commit the charged crimes against Guadalupe] and, thus, that they committed these crimes in association with the gang. [Citations.]" (*Albillar*, *supra*, 51 Cal.4th at p. 62; see *People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 661, fn. 7; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332; *People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198; cf. *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1361.) Accordingly, the evidence was sufficient to sustain the jury's gang enhancement findings as to counts 1 and 2.

## II

### JURY INSTRUCTIONS

Defendant raises a number of claims of purported instructional error.[31] We address each in turn.

---

[31] Except as to CALCRIM No. 1400, the Attorney General does not claim the issue has been forfeited for appeal.

A.      **First Degree Felony Murder**

Defendant contends the trial court erred by failing to instruct, as to first degree felony murder, that the jury had to find he aided and abetted the robbery before or at the time of the act(s) causing death.[32]  Under the instructions given, he says, the jury could have believed defendant was guilty of aiding and abetting a robbery in progress by acting as a getaway driver before Patterson had reached a place of temporary safety, and, hence, was automatically guilty of felony murder even though the acts that caused Guadalupe's death had already been committed before he aided and abetted.  We agree with defendant that his murder conviction must be reversed.[33]

1.      Background

The prosecution presented evidence from which the jury reasonably could have determined defendant was a coplanner of the robbery and participated in casing the Foods Co for a victim, then acted as the getaway driver for the actual robber — in other words, that he aided and abetted the robbery from the outset.  If jurors believed defendant's testimony, however, he had no idea ahead of time that Patterson was going to commit any kind of crime at the Foods Co, and only went to Patterson's aid (although suspecting

---

[32]     Defendant says this same error exists with respect to the robbery-murder special-circumstance instructions.  Because we are reversing the true finding on the special circumstance and the allegation cannot be retried, any instructional error with respect to the special circumstance is immaterial.  Accordingly, although portions of the robbery-murder special-circumstance instructions figure into our analysis, we address defendant's claim of error only with respect to the jury's first degree felony-murder verdict.

[33]     Reversal of the conviction necessitates reversal of the related section 186.22, subdivision (b) enhancement.  (See, e.g., *People v. Montes* (2014) 58 Cal.4th 809, 898; *People v. Petrilli* (2014) 226 Cal.App.4th 814, 828.)  Because sufficient evidence supports the enhancement, however, it can be retried along with the murder charge.  (See *People v. Zarazua* (2008) 162 Cal.App.4th 1348, 1359, fn. 18.)

Patterson had committed some kind of crime) after he saw Patterson running away from the store.[34]

Without objection or modification, the trial court gave CALCRIM No. 1603 in conjunction with instructions on robbery, as charged in counts 2 and 4, to wit:

> "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety. A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property."

During the jury instruction conference, the parties agreed the only applicable theory of first degree murder was felony murder. The People requested that CALCRIM No. 540B be given; defense counsel had no objection. Pursuant to that instruction, the trial court told the jury:

> "The defendant is charged in Count 1 with murder under a theory of felony murder. The defendant may be guilty of murder under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator.
>
> "To prove that the defendant is guilty of first-degree murder under this theory, the People must prove that: One, the defendant aided and abetted or was a member of a conspiracy to commit robbery; two, the defendant intended to aid and abet the perpetrator in committing or intended that one or more members of the conspiracy commit robbery; three, if the defendant did not personally commit robbery, then a perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed robbery; four, while committing robbery, the perpetrator caused the death of another person; and five, there was a logical connection between the cause of death and the robbery. The

---

[34] During the jury instruction conference, the parties discussed whether the trial court should accede to defendant's request for an instruction on accessory after the fact. The trial court acknowledged there was evidence, if believed, that defendant was not aware of the commission of a crime until after he started driving Patterson away, but then he continued to drive Patterson away after becoming aware.

connection between the cause of death and the robbery must involve more than just their occurrence at the same time and place.

"A person may be guilty of felony murder even if the killing was unintentional, accidental or negligent.

"To decide whether the perpetrator committed robbery, please refer to the separate instructions that I will give you on that crime.

"To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I have given you on aiding and abetting. You must apply those instructions when you decide whether the People have proved first-degree murder under a theory of felony murder.

"It is not required that the person die immediately, as long as the cause of death and the felony are part of one continuous transaction.

"It is not required that the defendant be present when the death occurs."

For reasons not apparent from the jury instruction conference, the trial court omitted a bracketed paragraph from the instruction that would have told jurors: "[The defendant must have (intended to commit[,]/ [or] aid and abet[,]/ [or] been a member of a conspiracy to commit) the (felony/felonies) of ___ <insert felony or felonies from Pen. Code, § 189> before or at the time that (he/she) caused the death.]"

With respect to the robbery-murder special circumstance, and without objection, the trial court gave CALCRIM No. 703, which told the jury, in pertinent part:

"If you decide that the defendant is guilty of first-degree murder but was not the actual killer, then when you consider the special circumstance of whether the murder was committed by the defendant while engaged in the commission of or acting as an accomplice to the crime of robbery, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.

"In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first-degree murder as an aider and abettor, the People must prove either that the defendant intended to kill or the People must prove all of the following: One, the defendant's participation in the crime began before or during the killing; two, the defendant was a major participant in the crime; and three, when the

41.

defendant participated in the crime, he acted with reckless indifference to human life."

Finally, with the agreement of both parties, the trial court modified CALCRIM No. 730 to delete language referring to conspiracy. It then instructed the jury:

> "The defendant is charged with the special circumstance of murder committed while engaged in the commission of robbery. To prove that this special circumstance is true, the People must prove that: One, the defendant aided and abetted a robbery; two, the defendant intended to aid and abet the perpetrator in committing a robbery; three, if the defendant did not personally commit the robbery, then a perpetrator whom the defendant was aiding and abetting before or during the killing personally committed a robbery; four, the perpetrator did an act that caused the death of another person; five, the act causing the death and the robbery were part of one continuous transaction; and six, there was a logical connection between the act causing the death and the robbery. The connection between the fatal act and the robbery must involve more than just their occurrence at the same time and place.

> "To decide whether the perpetrator committed robbery, please refer to the separate instructions that I will give you on that crime.

> "To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I have given you on aiding and abetting. You must apply those instructions when you decide whether the People have proved first-degree murder under a theory of felony murder."

The final sentence quoted above was contained in both the court's oral and written instructions, a copy of which was given to the jury. The sentence should have read: "You must apply those instructions when you decide whether the People have proved *this special circumstance*." (Italics added.) Again, the trial court omitted the portion of the instruction that would have told jurors: "[The defendant must have (intended to commit[,]/ [or] aided and abetted/ [or] been a member of a conspiracy to commit) the (felony/felonies) of ___ *<insert felony or felonies from Pen. Code, § 190.2(a)(17)>* before or at the time of the act causing the death.]"

42.

2.     Analysis

"""[T]he crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place."" [Citation.] As a result, the commission of a robbery is ongoing '"until the robber has won his way to a place of temporary safety."" [Citation.] A robber has not reached a place of temporary safety while an immediate and active pursuit to recover the property is in progress. [Citation.]" (*People v. Debose* (2014) 59 Cal.4th 177, 205.) Because of this, for aider and abettor liability where *robbery* is concerned, "a getaway driver must form the intent to facilitate or encourage commission of the robbery prior to or during the carrying away of the loot to a place of temporary safety." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. & italics omitted; see *id.* at pp. 1169-1170.) As given here, CALCRIM No. 1603 correctly conveyed these legal principles with respect to the robbery charges.

Where the complicity of an aider and abettor in *felony murder* is concerned, however, different legal principles apply. In *People v. Pulido* (1997) 15 Cal.4th 713 (*Pulido*), the California Supreme Court "address[ed] a question regarding the scope of complicity in robbery murder. If one person, acting alone, kills in the perpetration of a robbery, and another person *thereafter* aids and abets the robber in the asportation and securing of the property taken, is the second person guilty of first degree murder under section 189? [The court] conclude[d] the answer is no. Although the second person is an accomplice to robbery [citation], such participation in the robbery does not subject the accomplice to murder liability under section 189, because the killer and accomplice were not 'jointly engaged at the time of such killing' in a robbery [citation]; the killer, in other

43.

words, was not acting, at the time of the killing, in furtherance of a 'common' design to rob [citation]." (*Id*. at p. 716.)[35]

In *Pulido*, the victim was shot in the head and died within seconds. (*Pulido*, *supra*, 15 Cal.4th at p. 717.) The court thus had no occasion to clarify the law with respect to the situation present here, in which the act or acts causing death are separated by a significant period of time from the death itself.[36] Other opinions make it clear, however, that what matters for purposes of felony-murder liability has always been the time of commission of the acts that resulted in the victim's death, even if death did not immediately result. (See, e.g., *People v. Cavitt*, *supra*, 33 Cal.4th at p. 196; *People v. Lewis* (2001) 25 Cal.4th 610, 647; *People v. Alvarez* (1996) 14 Cal.4th 155, 222; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1016; *People v. Celis* (2006) 141 Cal.App.4th 466, 473; *People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1396.)

In the present case, if the prosecution's version of events was accepted, defendant was guilty of robbery and first degree felony murder. If the defense's version was accepted, however, at most defendant was guilty of robbery. In light of the foregoing, the omitted paragraph of CALCRIM No. 540B, quoted *ante*, was a correct statement of the law and was factually applicable to the present case. Although the record does not show defendant objected to its omission, we believe the trial court should have included it on

---

[35] "It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' [Citations.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) Defendant's jury was so instructed.

[36] The *Pulido* court referred variously to complicity in a felony murder not extending to "one who joins the felonious enterprise after the killing has been completed" (*Pulido*, *supra*, 15 Cal.4th at p. 722), the requirement that the accomplice have been a conspirator or aider and abettor in the felony "at the time of the killing" (*id*. at p. 723), and its refusal to extend the first degree felony-murder rule to include aiders and abettors who joined the felonious enterprise "only after the murder has been completed" (*id*. at p. 726).

44.

its own motion, with a slight modification so that the final clause referred to the time the perpetrator (rather than the defendant) caused death.

"A trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.]" (*People v. Marks* (1988) 45 Cal.3d 1335, 1345.) One of the Bench Notes following CALCRIM No. 540B advises that if there is evidence the defendant did not form the intent to commit the felony, or did not aid and abet the felony, until after the homicide, he or she is entitled *on request* to an instruction pinpointing the issue, and in such instances, the bracketed paragraph quoted *ante* should be given. Such notes do not have the force of law, however. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1381.) Moreover, in each of the cases cited as authority (*People v. Silva* (2001) 25 Cal.4th 345, 371; *People v. Hudson* (1955) 45 Cal.2d 121, 124-127; see *People v. Turner* (1990) 50 Cal.3d 668, 691), the defendant was the actual killer. Even if it did not inspire confidence, defendant's testimony constitutes substantial evidence in support of a finding of robbery but not felony murder. (See *People v. Melton* (1988) 44 Cal.3d 713, 746; *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446.) Because the general instructions given by the court did not inform the jury that defendant had to have aided and abetted the robbery before the acts that resulted in Guadalupe's death in order to be found guilty of felony murder, the court had a sua sponte duty to instruct the jury on the timing of defendant's intent. (*People v. Esquivel*, *supra*, 28 Cal.App.4th at p. 1399; see *People v. Riccardi* (2012) 54 Cal.4th 758, 837-838; *People v. D'Arcy* (2010) 48 Cal.4th 257, 296-297; *People v. Marks*, *supra*, 45 Cal.3d at p. 1345; *People v. Anderson* (2006) 141 Cal.App.4th 430, 446-447.)

Jurors were directed to consider the instructions together. As jurors are presumed to follow the instructions given by the court (*People v. Murtishaw* (1989) 48 Cal.3d 1001, 1044), we presume they did so. Accordingly, we must assess the effect of the giving of CALCRIM No. 1603, which described the timing of an aider and abettor's formation of intent vis-à-vis robbery, with the truncated version of CALCRIM No. 540B, which

45.

omitted a description of the timing of an aider and abettor's formation of intent vis-à-vis felony murder. "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. [Citations.]" (*People v. Tate* (2010) 49 Cal.4th 635, 696; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4; *Boyde v. California* (1990) 494 U.S. 370, 380.) We also consider the arguments of counsel in assessing the probable impact of the instruction or instructions on the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1202; see *Weeks v. Angelone* (2000) 528 U.S. 225, 236.) We independently determine whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Taken together, CALCRIM Nos. 540B and 1603, as given in this case, permitted defendant to be found guilty of felony murder even if he did not aid and abet the robbery until after commission of the act that caused Guadalupe's death. This was error.

Instructional error affecting an element of the charged offense warrants reversal unless it is harmless beyond a reasonable doubt. (*People v. Cooper*, *supra*, 53 Cal.3d at p. 1171; see *People v. Wilkins* (2013) 56 Cal.4th 333, 348-350.) Likewise, when the jury is given the option of relying on two theories of guilt, one of which is legally correct but the other of which is legally incorrect, reversal is required unless the record demonstrates, beyond a reasonable doubt, that the verdict was actually based on a valid ground. (*People v. Chun* (2009) 45 Cal.4th 1172, 1203; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129; *People v. Green* (1980) 27 Cal.3d 1, 69, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239 & *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3; see *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 58; *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)[37] In making this determination, we must consider what effect the error had upon the guilty verdict *in this case*, and so we must look "to the basis on which

---

[37]    A legally incorrect theory is one "which, if relied upon by the jury, could not *as a matter of law* validly support a conviction of the charged offense." (*People v. Harris* (1994) 9 Cal.4th 407, 419, fn. omitted.)

46.

'the jury *actually rested* its verdict.' [Citation.]  The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; see *People v. Esquivel*, *supra*, 28 Cal.App.4th at pp. 1399-1400.)  As the California Supreme Court has explained, "*Neder* [*v. United States* (1999) 527 U.S. 1, 19] instructs us to 'conduct a thorough examination of the record.  If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error … it should not find the error harmless.' [Citation.]" (*People v. Mil* (2012) 53 Cal.4th 400, 417.)

Error of the type present here may be found harmless where the jury resolved the issue against the defendant in another context, pursuant to other, properly given instructions.  (See, e.g., *People v. Sakarias* (2000) 22 Cal.4th 596, 625; *People v. Hayes* (1990) 52 Cal.3d 577, 628; *People v. Sanders* (1990) 51 Cal.3d 471, 509-510.)  The Attorney General urges us to use this means to find the error harmless in the present case.  She says that taken together, the instructions on aiding and abetting, felony murder, and the special circumstance, and the jury's special circumstance finding, show the jury necessarily found defendant "had pre-force joinder"; hence, "'[t]he factual question posed by [giving the unmodified form of CALCRIM No. 1603 and deleting the bracketed language from CALCRIM No. 540B] was necessarily resolved adversely to defendant under other, properly given instructions.' [Citation.]" (*Pulido*, *supra*, 15 Cal.4th at p. 726.)  We disagree.

Pursuant to CALCRIM No. 401, jurors were instructed that "[t]o prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:  One, the perpetrator committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, *before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime*;

and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime." (Italics added.) Since there was no evidence anyone intended to commit the crime of murder, the crime referred to in the instruction can only be robbery. Yet CALCRIM No. 1603 permitted jurors to find defendant aided and abetted robbery even if he did not form the intent to aid and abet until the asportation phase of the crime. CALCRIM No. 540B, the instruction on first degree felony murder, merely required that defendant have aided and abetted robbery, and that "while committing robbery, the perpetrator caused the death of another person." Although the instruction went on to state, "It is not required that the person die immediately, as long as the cause of death and the felony are part of one continuous transaction," nothing in its language — particularly when considered with CALCRIM Nos. 401 and 1603 — required jurors to find defendant was aiding and abetting at the time of the act causing death.

The special circumstance instructions similarly do not allow us to say the jury necessarily resolved the issue adversely to defendant.[38] CALCRIM No. 703 required the People to prove, inter alia, that "the defendant's participation in the crime began before or during *the killing*." (Italics added.) CALCRIM No. 730 required the People to prove, inter alia, that "if the defendant did not personally commit the robbery, then a perpetrator whom the defendant was aiding and abetting before or during *the killing* personally committed a robbery; … the perpetrator did an act that caused the death of another person; [and] the act causing the death and the robbery were part of one continuous transaction." (Italics added.)

Jurors were told that words and phrases not specifically defined in the instructions were to be applied "using their ordinary, everyday meanings." The ordinary definition of "kill" is "to deprive of life : put to death : cause the death of." (Webster's 3d New

---

**38** Defendant argues that since the jury's finding on the special circumstance allegation was not supported by substantial evidence, it does not amount to a proper resolution of an issue. We express no opinion on this point.

48.

Internat. Dict. (1986) p. 1242.)  The common definition of "killing" includes "the act of one that kills; *esp* : MURDER, HOMICIDE" and "having the effect of killing : as … producing death." (*Ibid*.)

In light of the variance among the everyday meanings of "killing," it is reasonably likely one or more jurors interpreted the instructions as requiring that defendant's participation/aiding and abetting precede *Guadalupe's death itself*, and not the act that caused her death.[39]  Inclusion of the bracketed portion of CALCRIM No. 730 that informed jurors defendant must have aided and abetted before or at the time of the *act causing death* would have cured the problem (as would inclusion of that bracketed portion of CALCRIM No. 540B), because it would have clarified that the critical moment for felony-murder complicity was commission of the act causing death, and not death itself.  Without that clarification, however, it cannot be determined beyond a reasonable doubt that the giving of CALCRIM No. 1603 in its unmodified form, together with omission of the bracketed language from CALCRIM No. 540B, did not contribute to defendant's conviction of first degree murder.  (See *People v. Swain* (1996) 12 Cal.4th 593, 607.)  Nor can we "be certain beyond a reasonable doubt that the jury would have found defendant guilty of [first degree] murder had it been properly instructed." (*People v. Banks* (2014) 59 Cal.4th 1113, 1153, disapproved on another ground in *People v. Scott* (2015) ___ Cal.4th ___, ___, fn. 3 [2015 Cal. Lexis 3903, *45, fn. 3].)  While there would have been sufficient evidence to support a finding defendant aided and abetted before or during commission of the act causing death, jurors could have believed defendant's claim he only realized Patterson might have committed a crime, and decided to help Patterson, during the asportation phase of the robbery.  (See *People v. Haley* (2004) 34 Cal.4th 283, 310.)  Stated another way, "the evidence and the inferences that

---

[39]     "[A] victim's death is a sine qua non of murder .…" (*People v. Celis*, *supra*, 141 Cal.App.4th at p. 471.)  "[A] murder ends with the death of the victim." (*People v. Esquivel*, *supra*, 28 Cal.App.4th at p. 1397.)

may reasonably be drawn from the evidence … do not prove [defendant aided and abetted before or during the act that caused death] so overwhelmingly that the jury could not have had a reasonable doubt on the matter. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 44; see *People v. Riccardi*, *supra*, 54 Cal.4th at p. 839.)

The arguments of counsel did nothing to lessen the prejudicial impact of the instructions. For instance, the prosecutor told the jury:

> "In regards to Mr. McDonald, he is not alleged to be the actual perpetrator or the person who pulled the chain that [Guadalupe] was wearing that day. He is alleged to be what is called an aider and abettor. The difference is that he didn't pull the chain. As you see at the bottom [of the prosecutor's visual aid] they are both equally guilty. That is the only difference. He did not physically take that chain … but, because he was there to help, he was there to facilitate, he was there to encourage his gang buddy, he is equally guilty of robbery. *He's equally guilty of murder*.

> "Let's start with the different types of criminal liability that can lead you to being guilty of murder. You are the killer. You directly commit. You shoot somebody. You stab somebody. You pull the chain on an old lady and she falls to the ground and dies 45 minutes later. You directly committed that murder. You are guilty of murder.

> "In this case that's Mr. Patterson.

> "You can also be guilty of murder based on aiding and abetting, what I just spoke about. You aided and abetted a robbery. Robbery is a violent crime. You knew about the intention. You either actually committed the robbery or you knew someone was going to commit a robbery and, *during the course of that robbery*, you helped them. *You are guilty of murder*." (Italics added.)

The prosecutor also stated, with respect to the murder charge: "You're going to see aiding and abetting.… You have to have knowledge of the intent of the perpetrator to commit the crime before or during the commission of the crime. The defendant has to intend to aid or/and abet. That has to be the intent of Mr. McDonald in this case, *before or during the commission of that robbery …*." (Italics added.) In addition, the prosecutor told jurors:

50.

"Once you have started to act or move towards a robbery, if death results, it's first-degree murder. The killer, again, is responsible for the killing. A co-felon, a co-participant, somebody aiding and abetting is also equally liable if they embarked on that robbery with that person. [¶] … [¶]

"Again, *robbery is a continuing crime. It is not over until you reach a place of safety*, as alleged in Count 2 and 4.

"As to first-degree murder, Mr. McDonald is alleged to be an aider and abettor to the intended crime that he had knowledge of the intent of Mr. Patterson, that he had knowledge of the intent of Mr. Slaughter and, before or during *the commission of the crime*, he intended to aid and abet the perpetrator, again, Mr. Patterson. [¶] … [¶]

"Again, this jury instruction was read to you. You will have it in the back. I just put the pertinent portions down.

"The defendant either committed or aided and abetted a robbery. That's the first decision you have to make. If he committed or he aided and abetted the robbery, you move on from there. He intended to aid and abet the robbery, and *if, during the course of that robbery, before or during, somebody dies, he's guilty of murder under first-degree felony murder*. Those are the steps you take.

"You decide first about robbery, you decide about his intention as to that robbery, *and then if [Guadalupe] died during the course of that robbery, Mr. McDonald is guilty of murder*." (Italics added.)

Defense counsel argued defendant was at most an accessory after the fact. She told the jurors:

"What's an aider and abettor? Well, let me give you three examples so that it hits home .… If Mr. McDonald and Mr. Patterson at the Haley apartments said to each other, 'Hey, you know what, why don't we walk across the street, look for some old women. Why don't you go ahead and, you know, scope out the store. I'll sit in the car and, when I see you run, I'll go ahead and, you know, meet you on Height and Gurley.' Okay. Let's say that's what Mr. Patterson does. [Guadalupe], we know, died. You better believe Mr. McDonald would be an aider and abettor, okay? And he would be guilty of felony murder.

"Now let me give you a second scenario. Mr. McDonald is sitting in his car. He turns around and he sees Mr. Patterson pull the chain off [Guadalupe], and he had no idea … that Mr. Patterson was going to do that.

51.

He sees Mr. Patterson pull the chain, sees Mr. Patterson being chased right there, and says, oh, oh, I got to go help my gang buddy. Pulls back the car in the parking lot, says to Mr. Patterson, 'Hey, get in the car, okay? We're in this together. Let's get out of here.' Mr. McDonald would be an aider and abettor, *and you better believe he'd be guilty of felony murder*.

"Let's take a third scenario. Mr. McDonald is sitting in his car. He has no idea what Mr. Patterson is about to do. Mr. Patterson gets out, commits the robbery, starts to run through the parking lot. Mr. McDonald looks back and says, okay, something has happened, I don't know what. Is he mouthing off? Has he hit something? Has he stolen something? I have no idea. Pulls the car out; goes to Height and Gurley; is able to see where Mr. Patterson is; picks him up, okay? And at the moment Mr. Patterson gets in the car, doesn't know what has happened, drives on the horseshoe[-shaped portion of the street], and Mr. Patterson says, either on that street or the next street, … 'I pulled a chain from an old wom[a]n.' Is he an aider and abettor, Mr. McDonald? The answer to that is absolutely not. He is not an aider and abettor.

"Is he guilty of something? You better believe that. What's he guilty of? He is guilty of being an accessory after the fact." (Italics added.)

The instructions, taken as a whole, did not correctly state the law with respect to first degree felony-murder complicity of an aider and abettor. Neither attorney clarified the matter. The conviction on count 1 must be reversed, although it is supported by substantial evidence and so can be retried.

In light of the fact we are reversing the murder conviction, we need not address defendant's further claim the trial court erred by failing to instruct on involuntary manslaughter as a lesser included offense to felony murder.[40] For guidance of the court and parties upon retrial, however, we observe that if the trial court again finds sufficient

---

[40] "Even in the absence of a request, the trial court has a duty to instruct *sua sponte* on offenses necessarily included in the charged offense if there is sufficient evidence to support a conviction of the lesser included offense. [Citation.]" (*People v. Edwards* (1985) 39 Cal.3d 107, 116, fn. 10.) "Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. [Citation.] The mens rea for murder is specific intent to kill or conscious disregard for life. [Citation.] Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter. [Citations.]" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.)

evidence to warrant the giving of instructions on grand theft as a lesser included offense of robbery, and on the natural and probable consequence theory of second degree murder with an underlying offense of robbery or grand theft, it should also instruct on involuntary manslaughter.[41] As defendant asserts, if the jury were to find defendant lacked the knowledge and intent necessary to convict him of aiding and abetting a robbery, but that he aided and abetted grand theft, it would follow that the jury could find second degree murder (based on the risk the victim of grand theft might die of a heart attack) was too remote to be considered a natural and probable consequence, but find involuntary manslaughter based on the fact the victim was killed in the commission of a felony that was not inherently dangerous.[42]

---

[41] The instructions were given upon the People's request and over defense objection. With respect to the natural and probable consequences theory, the trial court told the jury, in pertinent part: "The defendant is charged with robbery or grand theft and with murder. You must decide whether the defendant is guilty of robbery or grand theft. If you find the defendant is guilty of either of these crimes, you must then decide whether he is guilty of murder. [¶] Under certain circumstances a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that the defendant is guilty of murder, the People must prove that: One, the defendant is guilty of robbery or grand theft; two, during the commission of the robbery or grand theft a co-participant in that robbery or grand theft committed the crime of murder; and three, under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the robbery or grand theft." The prosecutor subsequently explained to the jury that the natural and probable consequences doctrine came into play with respect to second degree murder.

[42] "'A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the … felonies enumerated in … § 189) constitutes at least second degree murder. [Citations.]' In determining whether the felony is inherently dangerous, 'we look to the elements of the felony in the abstract, not the particular "facts" of the case.' [Citations.]" (*People v. Patterson* (1989) 49 Cal.3d 615, 620-621.) Because grand theft is not a felony that is inherently dangerous to human life (*People v. Phillips* (1966) 64 Cal.2d 574, 583, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12), it cannot form the basis for a conviction of second degree murder on a felony-murder theory, but may support a finding of involuntary

53.

**B.     CALCRIM No. 361**[*]

Although it does not appear the instruction was requested by either party, the trial court found CALCRIM No. 361 "appropriate," given defendant's testimony. Accordingly, it instructed the jury:

> "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough, by itself, to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Defendant now contends the trial court erred by giving the instruction, because it was unsupported by the evidence. The Attorney General concedes error occurred (and that the issue has been preserved for appeal despite defense counsel's acquiescence in the giving of the instruction), but says the error was harmless. We agree with the Attorney General.

It is settled jurors properly may consider logical gaps in the defense case, and CALCRIM No. 361 reminds them of this power. (*People v. Redmond* (1981) 29 Cal.3d 904, 911.)[43]  However, "'before a jury can be instructed that it may draw a particular

---

manslaughter (*People v. Burroughs* (1984) 35 Cal.3d 824, 835-836, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 89).

[*]     See footnote, *ante*, page 1.

[43]     Many of the cases we and the parties cite deal with CALJIC No. 2.62, CALCRIM No. 361's counterpart. CALJIC No. 2.62 states: "In this case defendant has testified to certain matters. [¶] If you find that [a] [the] defendant failed to explain or deny any evidence against [him] [her] introduced by the prosecution which [he] [she] can reasonably be expected to deny or explain because of facts within [his] [her] knowledge, you may take that failure into consideration *as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable*. [¶] The failure of a defendant to deny or explain evidence against [him] [her] does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable

inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation].' [Citation.]" (*People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*).)

The applicability of CALCRIM No. 361 "is peculiarly dependent on the particular facts of the case." (*People v. Roehler* (1985) 167 Cal.App.3d 353, 393.) Whether the instruction may be given turns on an assessment of evidence adduced during "'the scope of relevant cross-examination'" of the defendant. (*Id*. at p. 392.) The instruction is not meant to be given, as a matter of course, whenever a defendant testifies. (See *People v. Marks*, *supra*, 45 Cal.3d at p. 1346.) Rather, it is proper only if the trial court preliminarily determines, as a matter of law, that the evidence supports a conclusion the defendant failed to bridge a gap in his or her case. It is then up to jurors to decide whether such a gap in fact exists and whether the instruction will be applied. (*People v. Roehler*, *supra*, 167 Cal.App.3d at p. 392.) As one court stated over 30 years ago, "it will always be unwise of a trial court to include [CALCRIM No. 361] among its general instructions without prior inquiry of the parties concerning it. In fact, today it should not even be requested by either side unless there is some specific and significant defense omission that the prosecution wishes to stress or the defense wishes to mitigate." (*People v. Haynes* (1983) 148 Cal.App.3d 1117, 1119-1120.)

---

doubt. [¶] If a defendant does not have the knowledge that [he] [she] would need to deny or to explain evidence against [him,] [her,] it would be unreasonable to draw an inference unfavorable to [him] [her] because of [his] [her] failure to deny or explain this evidence." (Italics added.)

Although there are some differences between the two instructions, cases addressing CALJIC No. 2.62 are, for the most part, equally applicable to CALCRIM No. 361. (See *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1067.) As we shall explain, however, we find the italicized portion of CALJIC No. 2.62 — which is not contained in CALCRIM No. 361 — significant in terms of defendant's claim, discussed *post*, that error in giving CALCRIM No. 361 was of federal constitutional dimension.

As a reviewing court, we must ascertain whether the record evidence supports a conclusion defendant failed to explain or deny any evidence within the scope of relevant cross-examination. (*Saddler*, *supra*, 24 Cal.3d at p. 682; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) "If the defendant has not been asked a question calling for an explanation or a denial, as a matter of law the instruction may not be given." (*People v. Mask* (1986) 188 Cal.App.3d 450, 455.) The contradiction of prosecution evidence does not constitute a failure to explain or deny. (*Saddler*, *supra*, 24 Cal.3d at p. 682.) Similarly, the test is not whether defendant's testimony was believable. (*People v. Kondor* (1988) 200 Cal.App.3d 52, 57.) If, however, "the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have known about circumstances claimed to be outside his knowledge is a credibility question for resolution by the jury. [Citations.]" (*People v. Mask*, *supra*, 188 Cal.App.3d at p. 455.)

We fail to find any basis for the giving of CALCRIM No. 361 in the present case. Accordingly, the trial court erred. (*Saddler*, *supra*, 24 Cal.3d at p. 683; *People v. Lamer*, *supra*, 110 Cal.App.4th at pp. 1470-1471.) Reversal is not required, however, because it is not reasonably probable the jury would have returned a verdict more favorable to defendant in the absence of the instruction. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *Saddler*, *supra*, 24 Cal.3d at pp. 681, 683 [applying *Watson* standard to erroneous giving of CALJIC No. 2.62]; *People v. Lamer*, *supra*, 110 Cal.App.4th at pp. 1471-1472 [same]; *People v. Roehler*, *supra*, 167 Cal.App.3d at p. 393 [same]; but see *People v. Tealer* (1975) 48 Cal.App.3d 598, 606-607 [applying *Chapman* beyond-a-reasonable-doubt standard where "net effect" of improper argument and instruction was to tell jury it could infer guilt from silence, in violation of *Griffin v. California* (1965) 380 U.S. 609].) The evidence against defendant with respect to both robberies and the gang participation counts (the only offenses with which remain before us) was strong. In his argument to the jury, the prosecutor did not focus on any purported *failure* to explain

or deny, but rather on the *credibility* (or lack thereof) of defendant's explanations and denials. (See *People v. Lamer*, *supra*, 110 Cal.App.4th at pp. 1472-1473.) Contrary to defendant's argument, we see no reasonable likelihood jurors might interpret CALCRIM No. 361 as shifting the burden of persuasion by placing on a testifying defendant an affirmative duty *adequately* to explain away adverse evidence. The instruction does not read, "If the defendant failed in his testimony *adequately* (or *satisfactorily*) to explain or deny evidence against him .…" (See *People v. Tate*, *supra*, 49 Cal.4th at p. 696.) The instruction does not "encourage[] the jury to equate nonevidence, i.e., failure to explain or deny, with the substantial evidence necessary in order to convict" (*People v. Roehler*, *supra*, 167 Cal.App.3d at p. 392); lighten the prosecution's burden of proof (*Saddler*, *supra*, 24 Cal.3d at pp. 679-680); or impermissibly single out, or unduly focus on, defendant's testimony (*id*. at pp. 680-681). It "does not direct the jury to draw an adverse inference. It applies only if the jury finds that the defendant failed to explain or deny evidence. It contains other portions favorable to the defense .…" (*People v. Ballard* (1991) 1 Cal.App.4th 752, 756-757.) In addition, defendant's jurors were told that some of the instructions might not apply, depending on their findings about the facts of the case, not to assume the court was suggesting anything about the facts just because it gave a particular instruction, and to follow the instructions that did apply. "While such an instruction does not render an otherwise improper instruction proper, it may be considered in assessing the prejudicial effect of an improper instruction." (*Saddler*, *supra*, 24 Cal.3d at p. 684.) We presume jurors disregarded CALCRIM No. 361. (See *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.)

Defendant contends, however, that the error should be assessed under the harmless-beyond-a-reasonable-doubt standard of *Chapman*, because CALCRIM No. 361 permitted the jury to draw an irrational adverse inference and thereby violated defendant's right to due process under the federal Constitution. As support for this claim, defendant relies primarily on *Ulster County Court v. Allen* (1979) 442 U.S. 140 (*Ulster*

*County*), which was decided slightly less than two months before *Saddler* and is not discussed in that case.

In *Ulster County*, the United States Supreme Court addressed the constitutionality of a New York statute under which, with certain exceptions, the presence of a firearm in an automobile was presumptive evidence of its illegal possession by all persons then occupying the vehicle. (*Ulster County*, *supra*, 442 U.S. at p. 142.) In pertinent part, the high court explained:

> "Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime — that is, an 'ultimate' or 'elemental' fact — from the existence of one or more 'evidentiary' or 'basic' facts. [Citations.] The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. [Citations.]

> "The most common evidentiary device is the entirely permissive inference or presumption, which allows — but does not require — the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. [Citation.] In that situation the basic fact may constitute prima facie evidence of the elemental fact. [Citation.] When reviewing this type of device, the Court has required the party challenging it to demonstrate its invalidity as applied to him. [Citations.] Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination." (*Ulster County*, *supra*, 442 U.S. at pp. 156-157.)

Contrary to defendant's assertion, case law involving mandatory and permissive presumptions of guilt are inapposite, because the language of CALCRIM No. 361 does not supply any such presumption. (See *Adamson v. California* (1947) 332 U.S. 46, 55-56, overruled on other grounds in *Griffin v. California*, *supra*, 380 U.S. at p. 612 & *Malloy v. Hogan* (1964) 378 U.S. 1, 2-3.)[44] Whatever might be said concerning the portion of CALJIC No. 2.62 we italicized earlier (*ante*, fn. 43), which allows a jury to consider a defendant's failure to explain or deny evidence as tending to indicate the truth of such evidence and to conclude those inferences that are unfavorable to the defendant are the more probable, such language is not included in CALCRIM No. 361. CALCRIM No. 361 does not tell the jury what sort of inferences to draw from the evidence, or suggest inferences adverse to the defendant are appropriate. Rather, the instruction leaves the determination of what conclusions may be inferred from a defendant's failure to explain or deny evidence to the jury. Accordingly, it does not lighten the prosecution's burden of proof or violate a defendant's right to due process. (*People v. Rodriguez*, *supra*, 170 Cal.App.4th at p. 1067; cf. *Schwendeman v. Wallenstein* (9th Cir. 1992) 971 F.2d 313, 316.)

## C.      Intent Required for Gang Enhancement

Pursuant to CALCRIM No. 1401, the trial court instructed the jury, in pertinent part:

---

**44**      In *Adamson v. California*, *supra*, 332 U.S. 46, the United States Supreme Court dealt with provisions of California law that authorized "comment by court and counsel upon the 'failure of the defendant to explain or to deny by his testimony any evidence or facts in the case against him.'" (*Id*. at pp. 55-56.) The case concerned whether, if the defendant did *not* testify, such comment violated the federal Constitution. (*Adamson v. California*, *supra*, at pp. 48-49.) Clearly, the high court's actual holding — that neither the Fifth Amendment's privilege against self-incrimination nor the Fourteenth Amendment's due process clause invalidated the state law provisions (*Adamson v. California*, *supra*, at pp. 49-56) — is an anachronism.

59.

"If you find the defendant guilty of the crimes charged in Counts 1, 2 and/or 4, you must then decide whether for each crime the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang.…

"To prove this allegation, the People must prove that: One, the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; and two, the defendant intended to assist, further or promote *criminal conduct by gang members*." (Italics added.)

Defendant now contends the instruction was erroneous because it failed to require a specific intent to benefit, further, or promote "'*the gang*.'" The misstatement of the intent element was prejudicial, he claims, because it allowed the jury to find the gang enhancement based on a specific intent to assist criminal conduct of certain gang members (specifically, Patterson and Slaughter) rather than the gang itself, and the prosecutor expressly urged the jury to construe the instruction in that manner.[45] We conclude the instruction correctly stated the law.

As previously stated, subdivision (b)(1) of section 186.22 prescribes imposition of enhanced punishment for "any person who is convicted of a felony committed for the

---

[45]     The prosecutor argued:  "As to the gang enhancements, you have to decide, again, does the gang exist?  And then you move on to, what is the defendant's level of participation?  I think he told you what his level of participation is in the East Side Crips. He's been doing it for 11 years.  What is the defendant's knowledge of the gang activities?  He told you that, too.  He knew the crimes of Mr. Slaughter.  He knew of other crimes that occurred in the gang.  You heard that through Officer Finney when he contacted Mr. McDonald 2012, 2010, what his knowledge was of the East Side Crips. And then last you have to decide as to the enhancements, what was the defendant's intent in relation to his gang, that being the East Side Crips?  [¶]  [Section ]186.22[, subdivision ](b) (1), that is following first-degree murder, second-degree murder and the two robbery counts.  The question before you, the defendant committed the crime, did he do it for the benefit of the East Side Crips or — it's an either/or — or in association with a criminal street gang, or in association with other members of his same gang?  That would be Lawrence Slaughter — Lump; Baby Rose — Christopher Patterson.  And he intended to assist, further or promote criminal conduct by gang members.  Again, Baby Rose, Lump."

benefit of, at the direction of, or in association with any criminal street gang, *with the specific intent to promote, further, or assist in any criminal conduct by gang members ….*" (Italics added.)[46]  As given in defendant's case, CALCRIM No. 1401 essentially tracked the statutory language.  The California Supreme Court has explained:

> "'[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.  If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' [Citations.]

> "The rule to be applied in determining whether the meaning of a statute is adequately conveyed by its express terms is well established.  When a word or phrase '"is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request."' [Citations.]  A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.]  Thus, … terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. [Citation.]" (*Estrada*, *supra*, 11 Cal.4th at pp. 574-575, citation omitted.)

"Member" and "membership" have been held to be terms of ordinary meaning that require no further definition.  (*People v. Green* (1991) 227 Cal.App.3d 692, 699, overruled on another ground in *People v. Castenada* (2000) 23 Cal.4th 743, 747-748, 752.)  Defendant says, however, that where, as here, both the gang offense and the gang enhancement are at issue, so that the jury is instructed in the language of both CALCRIM Nos. 1400 (as to the substantive offense) and 1401 (as to the enhancement), a problem arises because the term "gang members" means one thing in CALCRIM No. 1400 and

---

[46]     Subdivision (a) of section 186.22 defines a separate, substantive offense, rather than an enhancement, and specifies punishment for "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists *in any felonious criminal conduct by members of that gang ….*" (Italics added.)

something else in CALCRIM No. 1401.[47]  Defendant contends:  "In CALCRIM No. 1400, the term 'members' refers to the individual gang members who act in concert with the defendant in the commission of a felony.  In CALCRIM No. 1401, the term 'members' refers to the gang membership as a whole — the entire gang — rather than individual gang members."  This being the case, his argument runs, the trial court had a sua sponte duty to define the term as used in CALCRIM No. 1401, and its failure to perform this duty resulted in the jury being misinstructed.  We disagree.

In *Albillar*, the court, in an opinion written by Justice Baxter, addressed a case in which the defendants were convicted of forcible sex offenses while acting in concert, and active participation in a criminal street gang.  The jury found true the gang enhancement allegation as to the sex offenses.  (*Albillar*, *supra*, 51 Cal.4th at p. 50.)  With respect to the gang offense, the high court considered — and rejected — "the argument that the phrase 'any felonious criminal conduct' in section 186.22[, subdivision ](a) refers only to gang-related felonious criminal conduct .…"  (*Id*. at p. 59.)

With respect to the gang enhancement, one or more defendants contended (1) there was no evidence the sex offenses were committed for the benefit of, at the direction of, or in association with their gang; (2) there was no evidence the sex offenses were committed with the specific intent to promote, further, or assist *other* criminal conduct by gang members; and (3) there was no evidence the sex offenses were committed with the specific intent to facilitate criminal conduct by *the gang*.  The court determined none of the contentions had merit.  (*Albillar*, *supra*, 51 Cal.4th at p. 59.)

---

**47**      As given in defendant's trial, the pertinent part of CALCRIM No. 1400 told jurors:  "The defendant is charged in Count 3 with participating in a criminal street gang. To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1. The defendant actively participated in a criminal street gang;  [¶]  2. When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and  [¶]  3. The defendant willfully assisted, furthered or promoted felonious criminal conduct by members of the gang by, A, directly and actively committing a felony offense or, B, aiding and abetting a felony offense."

With respect to the defendants' third claim — the one that concerns us in the present case — the high court stated:

> "[An analysis similar to that by which the court rejected the defendants' second claim] disposes of the related argument …, that section 186.22[, subdivision ](b)(1) requires the specific intent to promote, further, or assist a *gang-related* crime. The enhancement already requires proof that the defendant commit a gang-related crime in the first prong — i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang. [Citation.] There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*. [Citations.] [¶] … [¶]

> "We also reject the argument …, that the constitutional requirement of personal guilt would compel the inclusion in the enhancement of a specific intent to aid the *gang*. The claim is specious. The enhancement set forth in section 186.22[, subdivision ](b)(1) does not pose a risk of conviction for mere nominal or passive involvement with a gang. Indeed, it does not depend on membership in a gang at all. Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang. Defendants cite no authority to suggest that this would run afoul of *Scales v. United States* [(1961)] 367 U.S. 203 [(*Scales*)], which upheld a statute criminalizing active membership in an organization that advocates the overthrow of the federal government by force or violence even in the *absence* of a specific act of criminality. [Citations.]

> "In sum, *if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members.* Here, there was ample evidence that defendants intended to attack [the victim], that they assisted each other in raping her, and that they were each members of the criminal street gang. Accordingly, there was substantial evidence that defendants acted with the specific intent to promote, further, or assist gang members in that criminal conduct." (*Albillar*, *supra*, 51 Cal.4th at pp. 67-68, last italics added.)

The *Albillar* opinion was unanimous with respect to its discussion of section 186.22, subdivision (a) and the second prong (specific intent) of section 186.22,

63.

subdivision (b)(1).[48]  We do not believe the foregoing italicized language could be clearer.  Nevertheless, defendant takes the view that the California Supreme Court's plurality opinion in *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*) altered its pronouncement in *Albillar*.  Defendant reads too much into *Rodriguez*.

In *Rodriguez*, *supra*, 55 Cal.4th 1125, the issue was whether *the substantive gang offense* could be violated by a gang member acting alone to commit a felony.  A majority of the court held it could not.  (*Id*. at p. 1128 (lead opn. of Corrigan, J.); see *id*. at p. 1139 (conc. opn. of Baxter, J.).)  In so ruling, the lead opinion found it "significant that the offense requires a defendant to promote, further, or assist *members* of the gang." (*Rodriguez*, *supra*, at p. 1131 (lead opn. of Corrigan, J.).)  Justice Corrigan explained: "Section 186.22[, subdivision ](a) speaks of 'criminal conduct by *members* of that gang.' (Italics added.)  '[M]embers' is a plural noun.  The words 'promotes, furthers, or assists' are the verbs describing the defendant's acts, which must be performed willfully.  The phrase 'any felonious criminal conduct' is the direct object of these verbs.  The prepositional phrase 'by members of that gang' indicates who performs the felonious criminal conduct.  Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct.  The plain meaning of section 186.22[, subdivision ](a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member.  [Citation.]"  (*Id*. at p. 1132 (lead opn. of Corrigan, J.).)

Defendant points to the fact that at times, the lead opinion in *Rodriguez* speaks, with reference to the gang enhancement, in terms of specific intent to promote, etc., *the gang*.  For instance, during a discussion of the constitutional concerns raised by *Scales*,

---

**48**    Two justices disagreed with the majority's conclusion the evidence supported a true finding on the first prong of the enhancement.  (See *Albillar*, *supra*, 51 Cal.4th at p. 68 (conc. & dis. opn. of Werdegar, J.).)

*supra*, 367 U.S. 203, *Rodriguez* states: "It is established, then, that one need not have the specific intent to promote, further, or benefit *the gang* to violate section 186.22[, subdivision ](a), nor must one commit a gang-related felony." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1135 (lead opn. of Corrigan, J.) italics added.) The opinion also states: "Section 186.22[, subdivision ](a) and section 186.22[, subdivision ](b)(1) strike at different things. The enhancement under section 186.22[, subdivision ](b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote *the gang*. [Citation.]" (*Id*. at p. 1138 (lead opn. of Corrigan, J.) italics added.) And: "[O]ur conclusion does not lead to absurd results. A lone gang member who commits a felony will not go unpunished; he or she will be convicted of the underlying felony. Further, such a gang member would not be protected from having that felony enhanced by section 186.22[, subdivision ](b)(1) …. Because the gang enhancement under section 186.22[, subdivision ](b)(1) requires both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist *the gang*, these requirements provide a nexus to gang activity sufficient to alleviate due process concerns. [Citation.]" (*Id*. at pp. 1138-1139 (lead opn. of Corrigan, J.) italics added.)

Defendant also points to Justice Baxter's concurring opinion in *Rodriguez*. Basing his conclusion "solely on the plain meaning of the express statutory language" and finding "no need to consider the constitutional implications of a contrary construction," Justice Baxter determined that "the gang offense requires felonious criminal conduct committed by at least two '[gang] members,' including any defendant who is a member of 'that gang.' [Citation.]" (*Rodriguez*, *supra*, 55 Cal.4th at p. 1140 (conc. opn. of Baxter, J.).) Justice Baxter further wrote:

> "I recognize, of course, that a seemingly similar reference to gang 'members' appears in both section 186.22[, subdivision ](a) and section 186.22[, subdivision ](b)(1). However, small but significant differences in

grammar and context make clear that the enhancement provision lacks the same multiple-actor condition as the gang offense.

"First, section 186.22[, subdivision ](b)(1), unlike section 186.22[, subdivision ](a), applies where the defendant, even if acting alone, 'specific[ally] inten[ds]' by his felonious action to promote, further, or assist in any criminal conduct by gang members. Section 186.22[, subdivision ](b)(1)'s reference to promoting, furthering, or assisting gang members thus merely describes a culpable mental state. By contrast, the gravamen of section 186.22[, subdivision ](a) is that the defendant's own criminal conduct must itself directly promote, further, or assist felonious criminal conduct by members of the gang. Thus, section 186.22[, subdivision ](a) implies joint criminal action with other gang members — an implication that does not necessarily arise in section 186.22[, subdivision ](b)(1). *This difference suggests we need not construe gang 'members' in each provision the same way.*

"The relevant two subdivisions also treat criminal conduct by gang 'members' differently. As noted, section 186.22[, subdivision ](a) plainly requires felonious criminal conduct committed in tandem by at least two gang members, one of whom may be the defendant. In contrast, nothing in section 186.22[, subdivision ](b)(1) states or implies that the criminal conduct by gang members which the defendant intends to promote, further, or assist is the same criminal conduct underlying the felony conviction subject to enhancement. For this reason too, the direct and specific link between criminal conduct committed by the defendant and that committed by other gang members set forth in the gang offense [citation] is not present in the gang enhancement [citation].

"Accordingly, I agree with Justice Corrigan that the gang offense …, unlike the gang enhancement …, does not extend to defendants who commit the requisite criminal conduct on their own." (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1140-1141 (conc. opn. of Baxter, J.) original italics omitted, italics added.)

"The discussion in an appellate decision is directed to the issue presented." (*People v. Colantuono* (1994) 7 Cal.4th 206, 221, fn. 13.) The issue presented in *Rodriguez* was whether a gang member acting alone could violate subdivision (a) of section 186.22. The italicized portions of the lead and concurring opinions must be read in light of that issue. We will not conclude an opinion addressing an issue specifically and solely related to section 186.22, subdivision (a) sub silentio overruled or significantly

altered an opinion directly addressing and explaining different language contained solely in section 186.22, subdivision (b)(1), particularly when, as in *Rodriguez*, the opinion mentions the language of section 186.22, subdivision (b)(1) only in context of its discussion of section 186.22, subdivision (a).

Defendant points to *People v. Rios* (2013) 222 Cal.App.4th 542 (*Rios*), in which the Court of Appeal concluded "that the holding of *Rodriguez* — that a lone actor cannot violate section 186.22, subdivision (a) — does not apply to the separate enhancement set forth in section 186.22, subdivision (b), which enhances punishment when a defendant is found, among other things, to have acted with the specific intent to further, promote or assist in criminal conduct by gang members." (*Id*. at p. 546.) Defendant says a holding subdivision (b) of section 186.22 "[can] apply to a lone actor … means that the specific intent element cannot refer to the intent to assist a gang-member accomplice (because a lone actor has no accomplice). Instead, the defendant must have the specific intent to promote, further, or assist criminal conduct by 'gang members' [as] a whole, or in other words, must have the specific intent to promote, further, or assist 'the gang.'"

We do not believe *Rios* assists defendant. Subdivision (b)(1) of section 186.22 requires a specific intent "to promote, further, or assist *in any criminal conduct by gang members* .…" (Italics added.) As Justice Baxter noted in his concurring opinion in *Rodriguez*, "nothing in [that subdivision] states or implies that the criminal conduct by gang members which the defendant intends to promote, further, or assist *is the same criminal conduct* underlying the felony conviction subject to enhancement." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1141 (conc. opn. of Baxter, J.).) But as Justice Baxter observed in his majority opinion in *Albillar*, "section 186.22[, subdivision ](b)(1) encompasses the specific intent to promote, further, or assist in *any* criminal conduct by gang members — including the current offenses .…" (*Albillar*, *supra*, 51 Cal.4th at p. 65.) He also wrote about the gang enhancement: "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the

specific intent to promote, further, or assist criminal conduct by *gang members*. [Citations.]"  (*Id*. at p. 67.)  As we previously pointed out, under *Albillar*, "if substantial evidence establishes that the defendant intended to and did commit the charged felony *with known members of a gang*, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct *by those gang members*," as required for the gang enhancement.  (*Id*. at p. 68, italics added.)

Although *Albillar* concerned the sufficiency of evidence to uphold a gang enhancement finding, CALCRIM No. 1401, as given in the present case, correctly stated the applicable law set out in that case, as did the prosecutor's related argument to the jury.  Nothing in *Rodriguez* suggests any change in *Albillar*'s interpretation of section 186.22, subdivision (b)(1).[49]  Accordingly, defendant's jury was not misinstructed on the gang enhancement.

## D.    CALCRIM No. 1400[*]

With respect to the substantive gang offense, defendant's jury was instructed pursuant to CALCRIM No. 1400, in pertinent part:

> "The defendant is charged in Count 3 with participating in a criminal street gang.  To prove that the defendant is guilty of this crime, the People must prove that:

---

[49]    Before *Albillar*, at least two appellate opinions found the specific intent required by section 186.22, subdivision (b) was established where the defendant committed the charged crime(s) with an accomplice he or she knew to be a fellow gang member. (*People v. Leon*, *supra*, 161 Cal.App.4th at p. 163; *People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198.)  Neither of these cases is even mentioned in *Rodriguez*, strengthening our conclusion the state high court had no intent to alter, and did not perceive itself as altering, the plain language of *Albillar* concerning the gang enhancement.  Since *Rodriguez* was decided, at least one appellate court has relied on *Albillar* to reach the conclusion the specific intent requirement was sufficiently shown by evidence the defendant intended to assist his fellow gang member in criminal conduct. (*People v. Gonzales* (2015) 232 Cal.App.4th 1449, 1464-1465.)

[*]    See footnote, *ante*, page 1.

"1. The defendant actively participated in a criminal street gang;

"2. When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and

"3. The defendant willfully assisted, furthered or promoted felonious criminal conduct by members of the gang by, A, directly and actively committing a felony offense or, B, aiding and abetting a felony offense.

"Active participation means involvement with a criminal street gang in a way that is more than passive or in name only. The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang or that he was an actual member of the gang. [¶] … [¶]

"Felonious criminal conduct means committing or attempting to commit the following crime: Robbery.

"To decide whether a member of the gang or the defendant's [*sic*] committed robbery, please refer to the separate instructions that I have given you on that crime.

"To prove that the defendant aided and abetted felonious criminal conduct by a member of the gang, the People must prove that: One, a member of the gang committed the crime; two, the defendant knew that the gang member intended to commit the crime; three, before or during the commission of the crime the defendant intended to aid and abet the gang member in committing the crime; and four, the defendant's words or conduct did, in fact, aid and abet the commission of the crime."

Defendant now says the instruction "does not convey the temporal requirement that the defendant must aid and abet the felony while actively participating in the gang. Instead, the elements stated in the instruction allowed the jury to convict in a case where it is shown that the defendant was an active participant in the past, without requiring a finding that he was an active participant at the time he aided and abetted the charged felony." We find no cause for reversal.

Subdivision (a) of section 186.22 provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in

69.

any felonious criminal conduct by members of that gang, shall be punished …." Thus, the elements of this offense are "(1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at p. 56.)

In *People v. Castenada*, *supra*, 23 Cal.4th at page 747, the California Supreme Court construed "actively participates in any criminal street gang" "as meaning involvement with a criminal street gang that is more than nominal or passive." From the statute's and high court's use of the present tense, the appellate court in *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509 determined (in the context of a claim of insufficient evidence) it is not enough that a defendant actively participated in a criminal street gang at some point in time. Rather, "[a] defendant's active participation must be shown at or reasonably near the time of the crime."

CALCRIM No. 1400 does not expressly state this principle. (Cf. *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 36 [trial court's instruction listed as an element that a person actively *and currently* participates in criminal street gang].) Because of this, defendant says, the trial court failed in its sua sponte duty to instruct fully on the elements of the offense. (See *People v. Mil*, *supra*, 53 Cal.4th at p. 409.) The Attorney General disagrees and says the issue, being one of clarity and completeness, was forfeited by defendant's failure to request clarifying or amplifying language at trial. (See *People v. Campos* (2007) 156 Cal.App.4th 1228, 1236 [generally, party may not complain on appeal that instruction correct in law and responsive to evidence was too general or incomplete unless party requested appropriate clarifying or amplifying language].) We tend to agree with the Attorney General.

If defendant thought the instruction did not adequately express the temporal aspect of the active participation element of the crime, he should have requested clarification or

amplification. He did not. On the other hand, section 1259 permits the review of any instruction given, though there was no objection raised in the trial court, if the defendant's substantial rights were affected thereby. "'"[A]scertaining whether … instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim — at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." [Citation.]' [Citation.]" (*People v. Mason* (2013) 218 Cal.App.4th 818, 824.) "Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review. [Citations.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

We give defendant the benefit of the doubt and address the merits of his claim. In so doing, we must consider the instruction "in the context of the instructions as a whole and the trial record" (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 72), including the attorneys' arguments (*Weeks v. Angelone*, *supra*, 528 U.S. at p. 236), to determine whether there is a reasonable likelihood the jury was misled into believing it could convict defendant on count 3 upon finding he was an active participant in the East Side Crips in the past, without also finding he was an active participant at the time he aided and abetted Patterson's robbery of Guadalupe. (See *People v. Tate*, *supra*, 49 Cal.4th at p. 696; see also *Estelle v. McGuire*, *supra*, 502 U.S. at pp. 72-73 & fn. 4; *Boyde v. California*, *supra*, 494 U.S. at p. 380.)

First, and most significantly, CALCRIM No. 1400, as given, defined "active participation" in the present tense. (See *People v. Castenada*, *supra*, 23 Cal.4th at p. 747.) Moreover, the instruction limited the felonious criminal conduct by a gang member defendant was required to have aided and abetted to robbery. Although Anderberg, the prosecution's gang expert, testified robbery was one of the East Side Crips' primary criminal activities, there was no evidence to suggest defendant (or, for that matter, Patterson or Slaughter) was ever involved in any robbery other than those currently charged.

Second, the evidence showed defendant had been a self-admitted member of the East Side Crips for over 10 years. As recently as May 16, 2012, he had knowledge of other members of the gang and current events within the gang. (See *People v. Garcia*, *supra*, 153 Cal.App.4th at p. 1509.) The gang expert opined defendant was an active member of the East Side Crips on the dates of the charged offenses.

Third, the prosecutor's argument did not suggest defendant could be convicted of violating section 186.22, subdivision (a) based on activities that were well in the past. Rather, the prosecutor's argument presupposed current active participation and emphasized for the jury the fact the felonious criminal conduct aided and abetted was the charged robberies. The prosecutor told the jury:

> "Count 3, the defendant actively participated in a criminal street gang.
>
> "Both of these do not require he actually be an active gang member. He testified that he was, but you don't have to be an active gang member for either of these two counts [*sic*].[50]
>
> "Count 3, an active participant. Somebody engaged in helping out the gang. It has to be beyond passive or nominal. If you're going out each day sitting on the corner at Union and California drinking a beer, that's not sufficient. But if you're out there, you're with gang members, you're committing the crimes, you're hanging out with them all the time, you're an active participant in a street gang. He told you he had been a member for 11 years.

---

**50** The Attorney General interprets "these two *counts*" as really meaning "these two *elements*," and so asserts the prosecutor really argued defendant "had to 'actually be an active gang member'" to be guilty of count 3. Defendant disputes this interpretation of the prosecutor's argument. We believe it is clear, from the fact the prosecutor had discussed the gang enhancements immediately prior to the quoted passage, that the prosecutor meant neither the enhancement nor the substantive offense required defendant be a gang *member*. The prosecutor clearly was not suggesting defendant need not be active in the gang in order to be convicted of the substantive offense; his very next statement belies such an interpretation.

72.

"Did the defendant know members of the gang — that being, again, the East Side Crips — engaged in a pattern of criminal gang activity? He testified that he had that knowledge. And, again, he willfully assisted, promoted or furthered, either by doing a crime or aiding and abetting. This relates back directly to the robbery alleged in Count 2, alleged in Count 1 that occurred at the Foods Co on Haley Street.

"In regards to this instruction, this is Jury Instruction 1400, at that — when you read it in the back, again, you will see aiding and abetting language is within that instruction."

In light of the foregoing, we conclude there is no reasonable likelihood defendant's jury was misled to his detriment by the absence of an express temporal requirement in CALCRIM No. 1400. Accordingly, the conviction on count 3 stands.[51]

## DISPOSITION

The convictions on counts 2, 3, and 4; the Penal Code section 186.22, subdivision (b) enhancement on count 2; and the prior strike and prison term enhancements are affirmed. The special circumstance finding as to count 1 is vacated and retrial is barred. The conviction on count 1 and related Penal Code section 186.22, subdivision (b) enhancement is reversed and the matter is remanded for further proceedings. Should the district attorney fail to give notice of intent to retry count 1 and

---

[51] The jury's verdict stated defendant was found "guilty of Felony, to wit: Actively Participate in the Criminal Street Gang, in violation of Section 186.22(a) of the Penal Code, *as charged in the third count of the Consolidated Information*." (Italics added.) Count 3 of the consolidated information charged defendant with actively participating in a criminal street gang on or about August 19, 2012. The Attorney General argues this means the jury necessarily found there was a temporal connection between defendant's active participation in the gang and the commission of the felony on or about August 19, 2012; hence, any error in CALCRIM No. 1400 was harmless beyond a reasonable doubt. Defendant suggests error in failing accurately to instruct on all elements of an offense cannot be found harmless by relying on the pleadings and the verdict. We need not determine whether he is correct (but see *People v. Jones* (2012) 54 Cal.4th 350, 359 [amended information and verdicts established jury convicted defendant of each crime due to his being caught with gun on specific date, not due to antecedent possession]; *People v. Paul* (1998) 18 Cal.4th 698, 706 [verdict is to be read in light of charging instrument and plea entered by defendant]), because the consolidated information was not read to defendant's jury or prospective jurors.

the related gang enhancement within 30 days of the issuance of remittitur in this case, the trial court shall proceed to resentence defendant on the remaining counts and enhancements.

_____

DETJEN, Acting P.J.

WE CONCUR:


_____

FRANSON, J.


_____

PEÑA, J.